## IV.

801 S.E.2d 260

**IN RE: A.L.C.M.**

**No. 16-0786**

Supreme Court of Appeals of West Virginia.

Submitted: February 28, 2017

Filed: June 9, 2017

---

Patrick Morrisey, Attorney General, Thomas M. Johnson, Jr., Deputy Attorney General, Erica N. Peterson, Assistant Attorney General, Charleston, West Virginia, Attorneys for the Petitioner, West Virginia Department of Health and Human Resources

Joseph J. Moses, Wheeling, West Virginia, Petitioner and Guardian ad Litem for the Minor Child, A.L.C.M.

Betsy Griffith, McPhail Law Office, Wheeling, West Virginia, Attorney for the Respondent, Father A.C.

Davis, Justice:

The instant proceeding is before the Court upon a question certified by the Circuit Court of Ohio County regarding the parameters of an abuse and neglect proceeding. By order entered August 17, 2016, the circuit court certified the following question to this Court:

> Is a Petition for Relief from Parental Abuse and Neglect alleging abuse and/or neglect of an unborn child who is subsequently born alive, actionable under West Virginia law?

The circuit court answered this question "YES."

Under the power vested in this Court by the governing authorities, we deem it necessary to reformulate the circuit court's certified question to more accurately address the facts involved in and issues raised by the case *sub judice*. *See* Syl. pt. 2, *Martino v. Barnett*, 215 W.Va. 123, 595 S.E.2d 65 (2004) (" 'When a certified question is not framed so that this Court is able to fully address the law which is involved in the question, then this Court retains the power to reformulate questions certified to it under both the Uniform Certification of Questions of Law Act found in *W. Va. Code*, 51-1A-1, *et seq.* and *W. Va. Code*, 58-5-2 [1967], the statute relating to certified questions from a circuit court of this State to this Court.' Syl. Pt. 3, *Kincaid v. Mangum*, 189 W.Va. 404, 432 S.E.2d 74 (1993)."). Accordingly, we reformulate the subject query as follows:

> When a child is born alive, is the presence of illegal drugs in the child's system at birth sufficient evidence that the child is an abused and/or neglected child to support the filing of an abuse and neglect petition?

We answer this question in the affirmative: when a child is born alive, the presence of illegal drugs in the child's system at birth constitutes sufficient evidence that the child

is an abused and/or neglected child, as those terms are defined by W. Va. Code § 49-1-201 (2015) (Repl. Vol. 2015), to support the filing of an abuse and neglect petition pursuant to W. Va. Code § 49-4-601 (2015) (Repl. Vol. 2015).

## I.

## FACTUAL AND PROCEDURAL HISTORY

The child subject to the underlying abuse and neglect proceeding, A.L.C.M.,[1] was born alive in February 2016 at 25 3/7 weeks gestation; upon birth, the child's umbilical cord tested positive for cocaine, opiates, codeine, hydrocodone, and oxycodone, which is indicative of Mother's undisputed prenatal drug use. The child's twin was not born alive; it is believed that A.L.C.M.'s twin died as a result of twin-to-twin transfusion syndrome[2] and conditions related to the twin's premature birth.[3] Following the child's birth, A.L.C.M. was transferred from Ohio Valley Medical Center in Wheeling, West Virginia, to Ruby Memorial Hospital in Morgantown, West Vir-

ginia, where the child remained in the NICU until being discharged on October 26, 2016.

It appears from the record[4] that Mother and Father had a casual relationship that began in spring 2015. During this time, Mother used illegal drugs and prescription medications that had not been prescribed for her, predominantly using heroin. Father, who has an extensive criminal record for dealing and distributing drugs, does not appear to have been dealing, distributing, or using any illegal drugs or ill-gotten prescription drugs during this time. The record also indicates that Father was working various construction jobs, while Mother was not employed. Upon learning of Mother's pregnancy in December 2015, around the 16th week of gestation, Mother and Father commenced a more committed dating relationship and began living together. Father testified that, while they cohabited, he discouraged Mother's use of drugs and would ask her to leave the apartment whenever he found evidence of Mother's drug use. Mother testified that she was aware of Father's disapproval of her drug use and admitted that she would lie to Fa-

---

1. We follow our longstanding practice in cases involving sensitive facts and refer to the child by the child's initials only. *See, e.g., In re: S.H.*, 237 W.Va. 626, 628 n.1, 789 S.E.2d 163, 165 n.1 (2016). *See also* W. Va. R. App. P. 40(e) (restricting use of personal identifiers in cases involving children).

2. Twin-to-twin transfusion syndrome is defined as

    [a] complication of monochorionic multiple pregnancies in which one fetus receives a greater flow of blood than the other from the placenta. It is diagnosed by fetal ultrasonography: one twin's amniotic sac has polyhydramnios (excessive amniotic fluid), while the other twin's sac has oligohydramnios (insufficient amniotic fluid). Death of one or both twins will occur without intervention. Treatments include repeated amniocenteses, laser therapy to prevent the exchange of blood between twins, or intrauterine surgery....

   Taber's Cyclopedic Medical Dictionary 2360-61 (22d ed. 2013). *Accord* Dorland's Illustrated Medical Dictionary 1851-52 (32d ed. 2012) (indicating that, in twin-twin transfusion syndrome, recipient twin usually develops congestive heart failure). The deceased twin of A.L.C.M., who was larger than A.L.C.M., appears to have been the recipient twin because that twin received a greater proportion of the prenatal blood supply than did A.L.C.M.

3. A.L.C.M.'s neonatologist could not definitively say to what extent Mother's prenatal drug use caused or contributed to the death of A.L.C.M.'s twin as compared to the twin's other conditions of twin-to-twin transfusion syndrome and prematurity. However, the doctor testified that Mother's prenatal use of cocaine could have contributed to the twins' premature births. The underlying abuse and neglect petition attributes the twin's death to twin-to-twin transfusion syndrome, prematurity, and fetal hydrops. *See* Mosby's Medical Dictionary 866 (9th ed. 2013) (defining "fetal hydrops" as "massive edema in the fetus or newborn, usually in association with severe erythroblastosis fetalis. Severe anemia and effusions of the pericardial, pleural, and peritoneal spaces also occur. The condition usually leads to death, even with immediate exchange transfusions after delivery.").

4. The record in this case consists primarily of DHHR's abuse and neglect petition, the Guardian ad Litem's report, various circuit court orders, Father's motion to dismiss, and hearing transcripts from Mother's adjudicatory and dispositional hearings and Father's adjudicatory hearing, although the circuit court has held Father's adjudication in abeyance pending our resolution of the instant certified question. *See infra* note 19. As such, the statement of alleged facts in this opinion is derived from these sources insofar as the circuit court's findings of fact are limited to those set forth in its certification order.

ther about needing money to buy household supplies and personal hygiene items in order to fund her addiction.

From December 2015, when Mother's pregnancy was discovered, until the child's birth in February 2016, Father took Mother to two [5] prenatal doctor's appointments.[6] The record also demonstrates that Father drove Mother to an out-of-state Subutex [7] clinic for treatment and paid for her Subutex prescription when he could afford to do so.[8] Additionally, Father stated that he contemplated having Mother involuntarily committed to a mental health facility so that she could receive treatment for her drug addiction, but Mother convinced him that she would agree to a voluntary commitment. Upon arrival at the facility, however, Mother changed her mind and refused to enter the facility's rehabilitation program. Father testified that, during this time, he continued to live with Mother in order to provide her support and to make sure she received the proper nutrition she needed for her pregnancy; he also said that he believed if he could provide Mother with a stable home environment, he might be able to encourage her to stop using drugs, particularly for the sake of the babies.

As previously noted, the twins were born prematurely in February 2016. On the day of their birth, Father stayed at the Wheeling hospital with the deceased twin and Mother until Mother's friend arrived to stay with her. Father then drove to Morgantown to visit A.L.C.M., who had been transferred there by helicopter following birth. Mother left the Wheeling hospital later that same day against medical advice. Father stated that, out of concern for Mother, her ongoing drug use, and her ability to parent A.L.C.M., he filed a mental hygiene petition that resulted in Mother's involuntary commitment to Hillcrest Behavioral Health Services on February 27, 2016, during which time she went through withdrawal.

On March 4, 2016, the West Virginia Department of Health and Human Resources ("DHHR") filed the instant abuse and neglect petition against both Mother and Father alleging that A.L.C.M. was an abused and/or neglected child.[9] The allegations of Father's misconduct vis-a-vis his child [10] include his failure to protect A.L.C.M. from Mother's drug use—both prenatal and ongoing after the twins' births—and his continued association with Mother, who DHHR considers to be a danger to and an unsuitable guardian for the child in light of her ongoing drug use and history of prior abuse and neglect proceedings.[11] In this regard, the petition specifically alleged that:

---

5. The record reflects that Mother had only two prenatal doctor's appointments between the time she learned of her pregnancy and her premature delivery of the twins.

6. It is unclear from the record to what extent Mother's prenatal drug use was discussed at these doctor's appointments, whether Father was permitted to accompany Mother into the exam room, or whether Father was given the opportunity to speak with Mother's doctor during these appointments.

7. The medication Mother received as treatment for her heroin addiction is alternately referenced in the record as Subutex and Suboxone. Both of these medications are used to wean persons addicted to heroin from the drug and to lessen withdrawal symptoms, which was a concern herein given Mother's pregnancy. *See generally* Drug Identification Bible 2014/2015 Edition 881 (2014/2015) (describing both "Subutex" and "Suboxone" as the "[b]rand name for a Schedule III medication used to treat narcotic addiction").

8. Testimony elicited during the hearings below indicated that the cost for the Subutex clinic

treatment and prescription was several hundred dollars per month. *See supra* note 7.

9. DHHR's petition concerned only A.L.C.M.; DHHR did not include A.L.C.M.'s deceased twin in this petition or file a separate petition alleging A.L.C.M.'s deceased twin to be an abused and/or neglected child.

10. During the pendency of the underlying abuse and neglect proceedings, Mother voluntarily relinquished her parental rights to A.L.C.M. and, thus, is not a party to the case *sub judice*. Nevertheless, it should be noted that, in addition to Mother's prenatal drug use, she has had her parental rights to one child involuntarily terminated, and she has placed her two other children in her grandmother's care. A.L.C.M., and the child's twin, are Father's first and only children, and he has had no prior charges of child abuse and/or neglect.

11. Following the circuit court's certification order, DHHR moved to amend the underlying abuse and neglect petition, which motion the circuit court granted. Insofar as the record con-

The Respondent [Father] has been dating [Mother] for the last year and a half. [Father] knew or should have known of [Mother's] drug abuse during her pregnancy and took no steps to try to stop the same.

[Father] has a history involving drug abuse and drug dealing and/or involvement with drugs himself, and this has led to criminal activity that has resulted in his incarceration.

[Father] has a criminal history including a conviction for unlawful taking of a vehicle in 1996; a conviction for conspiracy with intent to deliver crack cocaine in 1998, for which he was incarcerated for 87 months; a revocation of his supervised release in 2005; conviction for distribution of cocaine in 2005, with a 40 month sentence; a conviction in 2012 for delivery of marijuana, with a 1 to 5 year sentence; a conviction in 2013 for manufacturing or delivery of a controlled substance with a sentence of 1 to 5 years.

The Department cannot ensure the safety of the child in the care of [Father] or [Mother].

The infant [A.L.C.M.] has significant health issues, and [the child] will require extensive medical care and very attentive custodians. The Department cannot rely on Respondents [Mother and Father] to make sure this necessary medical care and attention is provided for the infant.

The petition further alleged that A.L.C.M. is an abused child and/or neglected child, as those terms are defined by W. Va. Code § 49-1-201 (2015) (Repl. Vol. 2015). Finally, the petition alleged that

Respondents' [Mother's and Father's] drug and/or alcohol use is pervasive and threatens the child's safety.

The infant [A.L.C.M.] is in imminent danger inasmuch as an emergency situation exists that threatens the welfare or the life of the child, pursuant to West Virginia Code § 49-1-201, as there is reasonable cause to believe that the infant is threatened by non-accidental trauma; substantial emotional injury inflicted by a parent, guardian or custodian; and the parent, guardian or custodian's abuse of alcohol or drugs or other controlled substance has impaired his or her parenting skills to a degree as to pose an imminent risk to the child's health or safety.[12]

(Footnote added).

Though both parents waived their preliminary hearings, Father nevertheless questioned his paternity of A.L.C.M. because of the possibility that another man was the child's father. During her dispositional hearing on June 2, 2016,[13] Mother voluntarily relinquished her parental rights to A.L.C.M. Following confirmation through paternity testing that Father is A.L.C.M.'s biological father, Father's adjudicatory hearing was scheduled. Prior to said hearing, however, Father filed a motion to dismiss the subject petition claiming that, pursuant to this Court's recent decision in *State v. Louk*, 237 W.Va. 200, 786 S.E.2d 219 (2016), an abuse and neglect proceeding could not be brought to protect a child who has not yet been born, and, thus, by extension, a parent could not be charged with injuries sustained *in utero*. The circuit court heard both Father's motion to dismiss and evidence regarding his adjudication on August 9, 2016.

Following the conclusion of the hearing, the circuit court held in abeyance a determination as to whether Father should be adjudicated to be an abusive and/or neglectful parent pending resolution of Father's motion to dismiss. As to this issue, the parties agreed to certify the following question to this Court insofar as it was deemed to be determinative of Father's motion to dismiss:

---

tains no evidence or testimony to support or refute the additional allegations of abuse and/or neglect, our consideration of this matter is limited to the allegations contained in the initial petition filed in March 2016.

**12.** *See id.* From the time of the child's birth until the filing of the petition, the child was in the hospital and never resided with the Respondent parents, including Father, who has no other children and has never been charged with child abuse and/or neglect until the instant proceeding. *See supra* note 10.

**13.** Father's adjudicatory hearing was stayed pending the outcome of the paternity testing.

Is a Petition for Relief from Parental Abuse and Neglect alleging abuse and/or neglect of an unborn child who is subsequently born alive, actionable under West Virginia law?

The circuit court answered this question in the affirmative by order entered August 17, 2016.[14] This Court then accepted the certified question for consideration.

## II.

## STANDARD OF REVIEW

With respect to questions certified to this court by a circuit court, we previously have held that "[t]he appellate standard of review of questions of law answered and certified by a circuit court is *de novo*." Syl. pt. 1, *Gallapoo v. Wal-Mart Stores, Inc.*, 197 W.Va. 172, 475 S.E.2d 172 (1996). In accordance with this standard, we will consider the parties' arguments.

## III.

## DISCUSSION

■ The instant proceeding is before this Court upon certification of a question of law by the Circuit Court of Ohio County.[15] Through this question, we are called upon to determine the extent to which, if any, a parent can be charged with abuse and/or neglect of a child who has suffered injuries in utero as a result of illegal drug use by the child's mother during her pregnancy. In this regard, the circuit court certified the following question to this Court:

Is a Petition for Relief from Parental Abuse and Neglect alleging abuse and/or neglect of an unborn child who is subsequently born alive, actionable under West Virginia law?

During the proceedings below, which gave rise to the subject certified question, DHHR filed a petition alleging that the subject child, A.L.C.M., was an abused and/or neglected child. This petition was filed *after* the child was born alive. Furthermore, DHHR did *not* file a separate petition alleging that the child's twin, who was not born alive, was an abused and/or neglected child or include the twin in the petition it filed regarding A.L.C.M. Therefore, DHHR never sought to protect a child in utero, but, rather, sought only to protect a child who had been born alive. In light of these facts of the case *sub judice*, we find it necessary to reform the certified question to more accurately depict the nature of the instant controversy.

■ Inherent in this Court's power to answer certified questions is the corresponding ability of this Court to rephrase a certified question when the facts and circumstances giving rise to the question so warrant. *See* Syl. pt. 2, *Martino v. Barnett*, 215 W.Va. 123, 595 S.E.2d 65 (2004) (" 'When a certified question is not framed so that this Court is able to fully address the law which is involved in the question, then this Court retains the power to reformulate questions certified to it under both the Uniform Certification of Questions of Law Act found in *W. Va. Code*, 51-1A-1, *et seq.* and *W. Va. Code*, 58-5-2 [1967], the statute relating to certified questions from a circuit court of this State to this Court.' Syl. Pt. 3, *Kincaid v. Mangum*, 189 W.Va. 404, 432 S.E.2d 74 (1993).").

■ Here, the certified question assumes facts that were not before the circuit court, *i.e.*, an unborn child, and asks us to resolve a hypothetical controversy insofar as the question contemplates the filing of an abuse and neglect petition seeking to protect an unborn child who later is born alive. However, this

14. Following entry of the circuit court's certification order, Father's motion for custody of his child was denied. A.L.C.M. was discharged from the hospital on October 26, 2016, and placed with a foster family who is equipped to care for a child with special needs.

15. At this juncture, we wish to recognize Father's counsel for her diligent representation of her client and her astute recognition of a possible discrepancy between DHHR's petition charging Father with abuse and/or neglect, the facts of the

case *sub judice*, and the recent decision of this Court in *State v. Louk*, 237 W.Va. 200, 786 S.E.2d 219 (2016), and, further, her determination to bring this matter to the circuit court's attention in the interest of vindicating her client's rights to his child. In fact, were it not for counsel's intrepid perseverance to achieve justice for her client, it is doubtful that we ever would have been presented with this critical issue of first impression.

Court is comprised to resolve only *actual*, not *potential*, controversies. *See, e.g.*, Syl. pt. 2, in part, *Harshbarger v. Gainer*, 184 W.Va. 656, 403 S.E.2d 399 (1991) (" 'Courts are not constituted for the purpose of making advisory decrees or resolving academic disputes.' *Mainella v. Board of Trustees of Policemen's Pension or Relief Fund of City of Fairmont*, 126 W.Va. 183, 185-86, 27 S.E.2d 486, 487-88 (1943)."). *See also State ex rel. ACF Indus., Inc. v. Vieweg*, 204 W. Va. 525, 533 n.13, 514 S.E.2d 176, 184 n.13 (1999) ("[T]his Court cannot issue an advisory opinion with respect to a hypothetical controversy.").

■ Moreover, the circuit court's question addresses the abuse and/or neglect of an *unborn* child who is subsequently born alive. However, DHHR never sought to protect an *unborn* child in this case. Rather, DHHR waited until *after* A.L.C.M.'s birth to file the underlying abuse and neglect petition, which was based, *in part*, upon the injuries the child received in utero as a result of the illegal drug use of the child's mother during her pregnancy; the petition also alleged that Father had failed to protect the child. Insofar as a court reviewing a petition alleging that a child has been abused and/or neglected must "base[ ] [its findings] upon conditions existing at the time of the filing of the petition and proven by clear and convincing evidence," W. Va. Code § 49-4-601(i) (2015) (Repl. Vol. 2015),[16] the certified question arising from such petition also should be based upon facts "existing at the time of the filing of the petition," *id.* Because the subject child had already been born alive[17] when DHHR filed

its petition, we therefore find it necessary to reformulate the circuit court's certified question to correspond with the conditions existing at that time, as follows:

> When a child is born alive, is the presence of illegal drugs in the child's system at birth sufficient evidence that the child is an abused and/or neglected child to support the filing of an abuse and neglect petition?

To resolve this query, we first must look to the statutes governing abuse and neglect cases for the definition of those terms.[18] W. Va. Code § 49-1-201 (2015) (Repl. Vol. 2015) defines an "abused child" as follows:

> "Abused child" means a child whose health or welfare is being harmed or threatened by:
>
> (A) A parent, guardian or custodian who knowingly or intentionally inflicts, attempts to inflict or knowingly allows another person to inflict, physical injury or mental or emotional injury, upon the child or another child in the home. Physical injury may include an injury to the child as a result of excessive corporal punishment;
>
> (B) Sexual abuse or sexual exploitation;
>
> (C) The sale or attempted sale of a child by a parent, guardian or custodian in violation of section fourteen-h, article two, chapter sixty-one of this code; or
>
> (D) Domestic violence as defined in section two hundred two, article twenty-seven, chapter forty-eight of this code.

Additionally, W. Va. Code § 49-1-201 defines "neglected child" as follows:

---

16. *Accord* Syl. pt. 1, *In Interest of S.C.*, 168 W.Va. 366, 284 S.E.2d 867 (1981) ("*W. Va. Code*; 49-6-2(c) [1980] [now W. Va. Code § 49-4-601(i)], requires the State Department of Welfare [now the Department of Health and Human Services], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition ... by clear and convincing proof.' The statute, however, does not specify any particular manner or mode of testimony or evidence by which the State Department of Welfare is obligated to meet this burden."); Syl. pt. 6, *In re Simmons Children*, 154 W.Va. 491, 177 S.E.2d 19 (1970) ("The right to custody of children by the parents is not absolute but is founded on natural law, and in order to separate a child from its parents on the ground of unfitness of the parents there must be clear, cogent and convincing proof.").

17. As such, we find the circuit court's reliance on this Court's prior decision in *Farley v. Sartin*, 195 W.Va. 671, 466 S.E.2d 522 (1995), to be misplaced insofar as *Farley* concerned an unborn child en ventre sa mere whereas the facts of the case *sub judice* involve a child who was born alive.

18. For this reason, we find our recent decision in *State v. Louk*, 237 W.Va. 200, 786 S.E.2d 219 (2016), to be distinguishable insofar as it decided matters regarding W. Va. Code § 61-8D-4a (1997) (Repl. Vol. 2014), a criminal statute, whereas the case *sub judice* arises in the context of abuse and neglect proceedings governed by W. Va. Code § 49-1-101 *et seq.*

"Neglected child" means a child:

(A) Whose physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent, guardian or custodian to supply the child with necessary food, clothing, shelter, supervision, medical care or education, when that refusal, failure or inability is not due primarily to a lack of financial means on the part of the parent, guardian or custodian;

(B) Who is presently without necessary food, clothing, shelter, medical care, education or supervision because of the disappearance or absence of the child's parent or custodian;

(C) "Neglected child" does not mean a child whose education is conducted within the provisions of section one [§ 18-8-1], article eight, chapter eighteen of this code.

When interpreting statutory provisions, we are guided by our longstanding rules of statutory construction. Our inquiry is bound by the Legislature's intent in promulgating the provision under review. "The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975). *Accord Lowe v. Richards*, 234 W.Va. 48, 55, 763 S.E.2d 64, 71 (2014) ("In our review of a statutory provision, it is essential to afford the enactment an interpretation that comports with the intent of the Legislature."); *In re Clifford K.*, 217 W.Va. 625, 633, 619 S.E.2d 138, 146 (2005) ("The cardinal rule of statutory interpretation is to first identify the legislative intent expressed in the promulgation at issue."); *Ewing v. Board of Educ. of Cnty. of Summers*, 202 W.Va. 228, 241, 503 S.E.2d 541, 554 (1998) ("To interpret a statutory provision, we must determine the legislative intent underlying the statute at issue." (citation omitted)).

Where the legislative intent is plain, we apply the statute as written without resorting to interpretative rules. "[I]f the legislative intent is clearly expressed in the statute, this Court is not at liberty to construe the statutory provision, but is obligated to apply its plain language." *Dan's Carworld, LLC v. Serian*, 223 W.Va. 478, 484, 677 S.E.2d 914, 920 (2009). *Accord State ex rel. McGraw v. Combs Servs.*, 206 W.Va. 512, 518, 526 S.E.2d 34, 40 (1999) ("Once the legislative intent underlying a particular statute has been ascertained, we proceed to consider the precise language thereof."); *Henry v. Benyo*, 203 W.Va. 172, 177, 506 S.E.2d 615, 620 (1998) ("When the legislative intent of a statute's terms is clear, we will apply, not construe, its plain language.").

Furthermore, where the statutory language is plain, we apply it without further construction. "When a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute." Syl. pt. 5, *State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars*, 144 W.Va. 137, 107 S.E.2d 353 (1959). *Accord* Syl. pt. 2, *Crockett v. Andrews*, 153 W.Va. 714, 172 S.E.2d 384 (1970) ("Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation."); Syl. pt. 1, *Dunlap v. State Comp. Dir.*, 149 W.Va. 266, 140 S.E.2d 448 (1965) ("Where the language of a statute is plain and unambiguous, there is no basis for application of rules of statutory construction; but courts must apply the statute according to the legislative intent plainly expressed therein."); Syl. pt. 2, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951) ("A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.").

Applying these tenets to the statute defining "abused child" and "neglected child," we find the Legislature's intention to be clear and the statute's wording to be plain. In essence, the provisions of W. Va. Code § 49-1-201 seek to protect a child who is harmed or threatened with harm from the person inflicting such injury or failing to meet the child's needs. As it relates to the instant proceeding, abuse may be inflicted knowingly or intentionally. Alternatively, the harm to the child does not have to be consummated, but may be only attempted and still

constitute abuse. Finally, a person who knowingly allows another person to abuse a child may also be charged with the abuse of that child. Similarly, neglect includes conduct that harms or threatens a child's welfare based upon the "refusal, failure or inability" to meet the child's needs. Neglectful conduct does not include, however, deprivation of a child's needs due to an economic inability to satisfy them. *See* W. Va. Code § 49-1-201.

The abusive and/or neglectful conduct at issue herein is twofold: (1) Mother's use of illegal drugs during her pregnancy and the resultant injuries that A.L.C.M. sustained as a result of such substance abuse and (2) Father's alleged [19] failure to stop Mother's use of illegal drugs during her pregnancy. Common sense dictates that the presence of drugs in a child's system at birth occurs in one of two ways—as a result of medical treatment administered to the pregnant mother or child in utero or because of the mother's substance abuse during pregnancy. Here, there is no evidence that the twins received medication in utero as part of their prenatal care during Mother's pregnancy. Therefore, the only other logical explanation for the presence of cocaine, opiates, codeine, hydrocodone, and oxycodone in A.L.C.M.'s system at birth is Mother's prenatal drug use, which she has admitted and which the record evidence confirms did, in fact, occur.

■■■ A petition alleging that a child has been abused and/or neglected may be filed under the following circumstances:

If the department [DHHR] or a reputable person believes that a child is neglected or abused, the department or the person may present a petition setting forth the facts to the circuit court in the county in which the child resides, or if the petition is being brought by the department, in the county in which the custodial respondent or other named party abuser resides, or in which the abuse or neglect occurred, or to the judge of the court in vacation. Under no circumstance may a party file a petition in more than one county based on the same set of facts.

W. Va. Code § 49-4-601(a). W. Va. Code § 49-4-601(b) defines the information that must be included in the petition alleging that a child has been abused and/or neglected:

The petition shall be verified by the oath of some credible person having knowledge of the facts. *The petition shall allege specific conduct including* time and place, *how the conduct comes within the statutory definition of neglect or abuse with references thereto*, any supportive services provided by the department to remedy the alleged circumstances and the relief sought. . . .

(Emphasis added). We find these statutes also to be clear and unambiguous, and, thus, we apply the plain language used by the Legislature. *See, e.g.,* Syl. pt. 5, *General Daniel Morgan Post No. 548,* 144 W.Va. 137, 107 S.E.2d 353. Pursuant to these provisions, a petition alleging that a child has been abused and/or neglected is sufficient if the conduct alleged to be abusive and/or neglectful "comes within the statutory definition" of those terms. W. Va. Code § 49-4-601(b).

In other words, if the conduct alleged to constitute abuse and/or neglect comes within the statutory definition of "abuse" and/or "neglect," such conduct is the proper subject of an abuse and/or neglect petition. As we observed, the presence of illegal drugs in a child's system at birth is indicative of the mother's use of such substances during her pregnancy, which conduct satisfies both the statutory definition of "abused child," *i.e.,* "[a] parent . . . who knowingly . . . inflicts . . . physical injury . . . upon the child," W. Va. Code § 49-1-201, and the statutory definition of "neglected child," *i.e.,* a child "[w]hose physical . . . health is harmed . . . by a present refusal [or] failure . . . of the child's parent . . . to supply the child with necessary . . . supervision [or] medical care . . . when that refusal [or] failure . . . is not due primarily to a lack of financial means," *id.*

■■■ Moreover, with respect to Father's alleged failure to stop Mother's illegal

---

**19.** The abusive and/or neglectful conduct attributed to Father is "alleged" because the circuit court held his adjudicatory hearing in abeyance pending this Court's resolution of the instant certified question. *See supra* note 4.

drug use during her pregnancy, the statutes governing abuse and neglect proceedings allow a finding of abuse to be based upon a parent's knowledge that another person is harming his/her child. In this regard, W. Va. Code § 49-1-201 includes within the definition of "abused child"

> a child whose health or welfare is being harmed or threatened by:
>
> (A) A parent ... who ... knowingly allows another person to inflict ... physical injury or mental or emotional injury ... upon the child....

With respect to this statutory language, we previously have held that "W. Va. Code, 49-1-3(a) (1984) [now W. Va. Code § 49-1-201 (2015)], in part, defines an abused child to include one whose parent knowingly allows another person to commit the abuse." Syl. pt. 3, in part, *In re Betty J.W.*, 179 W.Va. 605, 371 S.E.2d 326 (1988). Moreover,

> [t]he term "knowingly" as used in West Virginia Code § 49-1-3(a)(1) (1995) [now W. Va. Code § 49-1-201] does not require that a parent actually be present at the time the abuse occurs, but rather that the parent was presented with sufficient facts from which he/she could have and should have recognized that abuse has occurred.

Syl. pt. 7, *West Virginia Dep't of Health & Human Res. ex rel. Wright v. Doris S.*, 197 W.Va. 489, 475 S.E.2d 865 (1996). Thus, for a child to be determined to be an "abused child," the parent charged with such abuse need not commit the abuse him/herself, so long as he/she knew that the subject abuse was being perpetrated, even if the alleged abuse occurs outside of the presence of the parent charged with such abuse. *Id.*

Accordingly, we now hold that when a child is born alive,[20] the presence of illegal drugs in the child's system at birth constitutes sufficient evidence that the child is an abused and/or neglected child, as those terms are defined by W. Va. Code § 49-1-201 (2015) (Repl. Vol. 2015), to support the filing of an abuse and neglect petition pursuant to W. Va. Code § 49-4-601 (2015) (Repl. Vol. 2015).[21] Therefore, we answer the certified question, as reformulated, in the affirmative.

## IV.

## CONCLUSION

The certified question having been answered, we remand this case to the Circuit Court of Ohio County for further proceedings consistent with this opinion.

Certified Question Answered.

CHIEF JUSTICE LOUGHRY concurs and reserves the right to file a concurring opinion.

JUSTICE WALKER concurs and reserves the right to file a concurring opinion.

LOUGHRY, Chief Justice, concurring, joined by WALKER, J.:

I concur whole-heartedly in the majority's conclusion that an abuse and neglect petition may be properly filed based upon the presence of drugs in a newborn's system. In my view, there is simply no question that a pregnant mother's drug use is child abuse of the type that must be remedied through our abuse and neglect system and prosecuted through our criminal justice system. I write separately, however, to cast a light on the

---

**20.** This holding, as well as its attendant discussion, necessarily is limited by the facts at issue in this case that have given rise to the question certified by the circuit court. That is to say that, as noted in this opinion, DHHR filed the subject abuse and neglect petition against parents of a newborn child, *not* against parents of a child still in utero. As such, we do not decide, and this opinion should not be construed as deciding, whether such a petition may be brought against parents of a child in utero.

**21.** We note that this holding is consistent with the result obtained in numerous cases previously decided by this Court in which we upheld a finding of abuse and/or neglect based upon the mother's illegal drug use during pregnancy and the presence of such illegal substances in the child's system at birth. *See, e.g., State ex rel. J.E.H.G. v. Kaufman*, No. 16-0931, 2017 WL 526398 (W. Va. Feb. 8, 2017) (memorandum decision); *In re L.L.*, No. 15-0703, 2016 WL 700555 (W. Va. Feb. 16, 2016) (memorandum decision); *In re J.J.*, No. 13-0094, 2013 WL 5476390 (W. Va. Oct. 1, 2013) (memorandum decision); *In re J.W.*, No. 12-0496, 2012 WL 4069651 (W. Va. Sept. 7, 2012) (memorandum decision); *In Re: Dejah Rose P.*, 216 W.Va. 514, 607 S.E.2d 843 (2004).

majority's plainly-manifested hypocrisy and result-oriented analysis in addressing precisely the same conduct last year in *State v. Louk*, 237 W.Va. 200, 786 S.E.2d 219 (2016). The majority evades the question squarely presented in this case for the sole purpose of "distinguishing" the *Louk* decision and disguising the contradictory reasoning employed therein. In *Louk*, the majority allowed a mother to escape prosecution for her *in utero* abuse of her child by focusing exclusively on the fact that the injurious conduct occurred *in utero*. Now, the majority reverses course and completely ignores the fact that the injurious conduct occurred *in utero*, for purposes of permitting an abuse and neglect petition in this matter. While I agree entirely with the majority's ultimate conclusion that such a petition is proper, the machinations it undertakes to reach that conclusion and camouflage its previous error warrants discussion.

The facts of this case are heart-breaking and infuriating at once. A.L.C.M. is the surviving twin who was born at approximately twenty-five weeks gestation; his twin brother died at birth. His mother, with the knowledge of the respondent, abused drugs throughout her pregnancy. A.L.C.M. was immediately life-flighted to the neonatal intensive care unit at Ruby Memorial Hospital in Morgantown at birth, where, as of the time of the below proceedings, he remained with a variety of very serious health concerns. During the course of these proceedings, A.L.C.M.'s mother voluntarily relinquished her rights to the infant. Expert testimony below described how A.L.C.M. was deprived of essential bonding and physical nurturing immediately after birth due to his mother's refusal to visit him—bonding and nurturing even more critically vital due to his premature birth and attendant health complications.

The certified question presented by the circuit court plainly and unmistakably asked this Court to answer whether an abuse and neglect petition was permissible where the abuse and/or neglect occurred while *in utero*. The majority tersely explains that since the petition was filed after A.L.C.M. was born alive, there is no "unborn child" at issue in this case and casually reformulates the certified question to suit its preferred discussion points. Without once dignifying the fact that the abuse in this case occurred *exclusively* while A.L.C.M. was *in utero*, the majority chooses to analyze the issue in a more politically comfortable manner and reaches the fairly obvious conclusion that a *post-natal* child who was abused by his or her mother's drug abuse *in utero* is properly made the subject of an abuse and neglect petition. By reformulating the question in this manner, the majority attempts to evade the question it so badly bungled in *Louk*: whether an unborn child is in fact a "child" for purposes of our system of justice.

In *Louk*, the majority purported to simply apply the statutory definition of "child," blithely suggesting that had the Legislature intended to criminalize Louk's conduct of harming her unborn child, it could have simply indicated as much. 237 W.Va. at 206, 786 S.E.2d at 225. Therefore, it concluded, Louk could not be criminally prosecuted for child abuse resulting in death. *Id.* at 209, 786 S.E.2d at 228. As I noted in my dissent, this conclusion ignores completely West Virginia's observance of the "born alive" rule which would unquestionably have criminalized Louk's behavior and permitted prosecution. *Id.* at 215–18, 786 S.E.2d at 234–37 (Loughry, J., dissenting). Nonetheless, despite suggesting that the issue was as simple as applying the statutory definition of "child," the majority in *Louk* belabored at length the fact that the abuse in that case was "*prenatal* conduct that affects a fetus in a manner apparent *after* birth[.]" *Id.* at 206, 786 S.E.2d at 225 (emphasis added). Focusing heavily on the timing of the injurious conduct, the majority therein aligned itself with jurisdictions which likewise refused to permit prosecution "for *prenatal* conduct causing harm to the *subsequently* born child[.]" *Id.* at 207, 786 S.E.2d at 226 (emphasis added). In short, the *Louk* majority determined that because Louk's unborn child was not, in its view, a statutorily-defined "child" *at the time of the criminal conduct*, criminal liability would not lie.

In the instant case, however, the majority neglects to address whether A.L.C.M. was a

statutorily defined "child" *at the time of the injurious conduct,* choosing instead to focus on whether he was a child when the abuse and neglect petition was filed.[1] In a remarkable turnabout, the majority abandons its *Louk* vantage point and ascertains that the proper measuring stick for actionable conduct is the purely procedural issue of the child's status *as of the time the abuse and neglect petition is filed,* rather than at the time of the alleged abuse and neglect. Demonstrating that the reasoning in *Louk* is completely incongruous with the majority's rationale herein, a Tennessee Court of Appeals expressly rejected the *Louk*-type reasoning regarding the timing of the harm to conclude that a finding of abuse may be based on *in utero* abuse: "[A] finding of abuse can be based on conduct that occurs at one time and injury that occurs at another. The Mother's argument that all the components of abuse must 'exist concurrently' is a prime example of circular reasoning that offers nothing other than its own weight for support." *In re Benjamin M.,* 310 S.W.3d 844, 848–49 (Tenn. Ct. App. 2009). By shifting focus to this procedural timing issue, the majority apparently believes it side-steps the issue of whether injurious conduct to an unborn child is actionable. In reality, all this analysis does is demonstrate how fickle the majority and malleable its reasoning when faced with hot-button social issues.[2]

That said, the majority plows no new ground in determining that an abuse and neglect petition is properly based upon a mother's drug abuse during pregnancy. As one New York family court stated:

> [I]t would be incongruous to imagine the Family Court Act's clear purpose being anything other than to protect children, including unborn children, from harm. Making a child endure an unsafe environment in the womb is ludicrous when this same child is afforded protection from illegal drugs and an unsafe environment the moment it takes its first breath outside the womb.

*In re Unborn Child,* 179 Misc.2d 1, 683 N.Y.S.2d 366, 370 (N.Y. Fam. Ct. 1998). This Court further reasoned that "[s]ince the common law of this state protects the fetus from negligent acts of a third party, then surely it may be found to encompass protection of the fetus from intentional acts by its mother, which acts could cause the child to begin life in an impaired condition." *Id. See also In re M.M.,* 200 Vt. 540, 133 A.3d 379 (2015) (finding child born, in part due to mother's substance abuse, addicted to opiates to be child in need of care of supervision); *S.P. v. Cabinet for Health & Family Servs.,* No. 2012–CA–000379–ME, 2012 WL 5830076 (Ky. Ct. App. Nov. 16, 2012) (finding that neglect of child by use of illegal drugs during pregnancy); *In re Baby Boy Blackshear,* 90 Ohio St.3d 197, 736 N.E.2d 462, 465 (2000) ("When a newborn child's toxicology screen yields a positive result for an illegal drug due to prenatal maternal drug abuse, the newborn is, for purposes of R.C. 2151.031(D), *per se* an abused child."); *In re Troy D.,* 215 Cal. App.3d 889, 263 Cal.Rptr. 869, 873 (1989) ("[A] living child must be afforded the protection of the juvenile court even though he is at risk because of his mother's actions before his birth."); *In re Ruiz,* 27 Ohio Misc.2d 31, 500 N.E.2d 935, 939 (Ohio Com. Pl. 1986) (finding because "a child does have a right to begin life with a sound mind and body," viable fetus is a child under the existing child abuse statute and harm to it may be considered abuse) *Matter of Baby X,* 97 Mich.App. 111,293 N.W.2d 736 (1980) (finding newborn suffering narcotics withdrawal symptoms as a consequence of prenatal maternal drug addiction may properly be con-

---

1. The majority reasons that since A.L.C.M. qualified as an "abused" or "neglected" child at the time the petition was filed, the petition was statutorily compliant. However, were we to take the majority's crabbed analysis to its logical conclusion, in point of fact, A.L.C.M. would *never* have been an abused or neglect "child" since neither mother nor the respondent has so much as had the opportunity to cause or inflict any degree of abuse or neglect since his birth—the time the majority clearly believes he became a statutorily-defined "child." A.L.C.M. was never in the custody or control of either parent from the time he was born.

2. Notably absent in this case is the legion of amici curia which filed briefs in the *Louk* case imploring the Court to yield to their public policy positions.

sidered a neglected child within the jurisdiction of the probate court).[3]

In sum, as my dissent in *Louk* and the foregoing emphasize, I agree whole-heartedly that "a child has a legal right to begin life with a sound mind and body" and that our system of justice serves no higher purpose than when it endeavors to preserve that right. *Baby X*, 293 N.W.2d at 739. I trust that this Court, when faced with legal issues bearing upon this right, will resolve such matters with judicious and sound reasoning which properly venerates that right. Accordingly, I respectfully concur.

---

**3.** Moreover, although not the question presently before the Court, in my view, a father's failure to act in the face of a mother's drug abuse, renders him an abusive and neglectful parent as per the objectives of our abuse and neglect system. Again, other courts have had little difficulty in agreeing with this conclusion. *See In re J.C.*, 233 Cal.App.4th 1, 182 Cal.Rptr.3d 215 (2014) (upholding neglect finding where there was sufficient evidence that father knew mother was taking drugs while she was pregnant and did nothing to protect his unborn child from her conduct); *Edward B. v. Arizona Dept. of Econ. Sec.*, No. 1 CA-JV 11-0235, 2012 WL 1207388, at *1 (Ariz. Ct. App. Apr. 10, 2012) (finding abuse and neglect petition proper where father, while living with mother during the pregnancy and being aware of her drug addiction, "neglected his child by failing to protect the child from Mother's substance abuse while pregnant with the child."); *In re S.K.A.*, No. 10-08-00347-CV, 2009 WL 2645027 (Tex. Ct. App. Aug.19, 2009) (holding father's failure to take any action to protect unborn child from mother's drug use was sufficient to establish that he knowingly allowed the child to remain in conditions and surroundings that endangered the child's physical well-being).