**FILED**

**November 10, 2021**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **S.H.-1 and S.H.-2**

**No. 20-1000**  (Boone County CC-03-2019-JA-151 and CC-03-2019-JA-152)

**MEMORANDUM DECISION**

The petitioner herein, Father J.H. ("Father"),[1] by counsel Elliott E. Workman, appeals an order entered November 17, 2020, by the Circuit Court of Boone County terminating Father's parental rights to his minor children, S.H.-1 and S.H.-2.[2]  The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey, Attorney General, S.L. Evans and Brittany N. Ryers-Hindbaugh, Assistant Attorneys General, and the children's Guardian ad Litem ("Guardian"), L. Scott Briscoe, respond in support of the circuit court's order.

This Court has considered the parties' briefs, oral arguments, and the appendix record on appeal.  Upon consideration of the standard of review and the applicable law, we find no substantial question of law has been presented nor is there prejudicial error.  For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the West Virginia Rules of Appellate Procedure.

Prior to the events giving rise to the initial abuse and neglect petition in this case, the children's mother, K.R. ("Mother"),[3] and Father had a long-term relationship, although the record evidence is conflicting as to whether they previously were married and subsequently divorced or whether their relationship was that of girlfriend and boyfriend, and they subsequently separated.  In February or March of 2019, Mother and the children moved out of the father's home in Kentucky to Boone County, West Virginia, where they lived at times with Mother's father ("Maternal Grandfather") and also in Mother's separate,

---

[1] In cases such as this involving sensitive facts, we will refer to the parties by their initials only.  *See* W. Va. R. App. P. 40(e) (restricting use of personal identifiers in cases involving children); *In re S.H.*, 237 W. Va. 626, 628 n.1, 789 S.E.2d 163, 165 n.1 (2016).

[2] Because both of the children in this case share the same initials, we will refer to them as S.H.-1 and S.H.-2.

[3] Mother's parental rights also were involuntarily terminated during the underlying abuse and neglect proceedings.

1

nearby residence in Boone County, West Virginia; during this time, Father continued to live at his residence in Kentucky.[4]

In early November 2019, Maternal Grandfather and Mother's mother ("Maternal Grandmother") believed that Mother was acting oddly and transported her to the hospital for evaluation, where Mother remained for several days; Maternal Grandfather alleged that, while she was hospitalized, Mother tested positive for methamphetamine, but Mother has not confirmed this diagnosis. During this time it appears that Maternal Grandfather and/or the Maternal Grandmother's parents ("Maternal Great-Grandparents") cared for the children.

A few days after her release from the hospital, Mother asked Maternal Grandfather to return the children to her; it appears that Mother also had asked Father to drive to Maternal Grandfather's residence in Boone County to assist her in retrieving the children, where Father waited in his vehicle. Maternal Grandfather refused to return the children to Mother because, he claimed, he believed Mother was under the influence of illegal substances at that time, and he was afraid she would take the children to Kentucky where he would no longer have contact with them to ensure their safety. The parties do not dispute that Maternal Grandfather did not have a court order awarding him custody of the children. Ultimately, law enforcement was called to Maternal Grandfather's residence, and an apparent agreement was reached whereby the parties would cease contact with each other for the remainder of the evening and try to work matters out the following day.

Shortly thereafter, Mother returned to Maternal Grandfather's residence and again requested the children; at this time, Father also approached Maternal Grandfather's house and had a physical altercation with him. At some point during this encounter, law enforcement again was called to the residence, which resulted in Father's arrest and the referral of the matter to Child Protective Services ("CPS"). While the children were in Maternal Grandfather's residence during part of this incident, they had been moved to an upstairs bedroom with another adult family member; later in the evening, the children were moved to Maternal Great-Grandparents' home, which is where they were located when the CPS worker investigated. Because Mother would not agree to the implementation of a

---

[4] Because the children had lived continuously in West Virginia for more than six months before the commencement of the subject abuse and neglect proceedings, jurisdiction in West Virginia was proper under the Uniform Child Custody Jurisdiction and Enforcement Act. *See* W. Va. Code § 48-20-201(a)(1) (declaring West Virginia to have jurisdiction to hear child custody matter if, among other criteria, West Virginia "was the home state of the child within six months before the commencement of the proceeding"); Syl. pt. 3, *In re K.R.*, 229 W. Va. 733, 735 S.E.2d 882 (2012) ("To determine whether a state qualifies as a child's 'home state' for purposes of determining initial jurisdiction under W. Va. Code § 48-20-201(a) (Repl. Vol. 2009), a court must analyze whether any state qualified as the child's 'home state' at any time within the six months immediately preceding commencement of the action.").

safety plan, the CPS worker assumed legal custody of the children, but allowed Maternal Great-Grandparents to retain the children's physical custody. The DHHR then filed an initial petition alleging that both Mother and Father had abused and neglected the children during these events as a result of "violence, abuse of illegal substances, erratic behavior and mental instability." The circuit court thereafter ratified the DHHR's assumption of the children's custody.

A preliminary hearing was held on November 25, 2019, during which the DHHR acknowledged that, given that the children were not exposed to illegal substance abuse or violence during the above-described incident, and one or both parents retained their custodial rights to the children, the initial abuse and neglect petition may have been "prematurely filed." Nevertheless, the circuit court ordered both parents to submit to a baseline drug test in accordance with the Guardian's request therefor in light of Mother's recent hospitalization for alleged substance abuse. Father's instant drug screen results, which later were confirmed by laboratory testing of his same specimen, were positive for methamphetamine, amphetamine, and marijuana. Father's attorney informed the court that Father had a prescription for Adderall, to which the court responded that "Adderall does not show up as methamphetamine." Further proceedings were scheduled.

Thereafter, Father attended some of the subsequent hearings and multidisciplinary treatment team ("MDT") meetings in person or by phone, while he was absent from other hearings and meetings. Prior to and during the entire pendency of these proceedings, Father has lived and been employed in Kentucky, and his child support obligation for the children has been deducted from his paychecks. The parties represented during oral argument that the record does not contain an order directing Father to submit to additional drug screens or any requests by the DHHR for him to do so.

On February 4, 2020, the DHHR filed an amended abuse and neglect petition against Father that additionally alleged abusive and/or neglectful conduct as follows:

> Adult Respondent, [Father,] abuses illegal controlled substances, specifically Methamphetamine and Marijuana, testing positive on November 25, 2019[,] during his preliminary hearing on his abuse and neglect case before the [c]ourt. Further, Adult Respondent [Father] has abandoned his children, making no attempt to have contact with them or participate with the court case or with the Department [DHHR] in trying to improve his parenting in order to have a relationship with his children. [Father] has failed to fulfill his legal responsibility as a parent to provide for his child[ren's] financial for [sic] his [sic] basic needs. He has failed to fill [sic] his psychological and emotional responsibility as a parent. [Father] has not participated in any MDT's and did not appear at the last court hearing on this matter. [Father] has demonstrated through his conduct that his purpose is to forego the duties and parental responsibilities to the children, [S.H.-1] and [S.H.-2]

(Emphasis omitted).

The court then held an adjudicatory hearing on February 24, 2020, during which Father did not testify, and the court found that Father had abused and neglected the children by virtue of his positive drug test for methamphetamine. An adjudication order memorializing the court's ruling was entered on April 3, 2020.

The final dispositional hearing in the matter was held on September 18, 2020; Father did not testify at either this dispositional hearing or the previous dispositional hearing held in this case. By dispositional order entered November 17, 2020, the circuit court terminated Father's parental rights, ruling that

> [t]he [c]ourt FINDS that Adult Respondent [Father] tested positive for methamphetamine and marijuana on February [sic] 25, 2020 [sic]. The [c]ourt FINDS that [Father] failed to submit to any further drug screens. The [c]ourt FINDS that [Father] has not completed substance abuse treatment of any kind during the course of these proceedings. The [c]ourt makes the inference that Adult Respondent [Father] chose not to testify at this hearing because he did not want to testify about his substance abuse. The [c]ourt FINDS that [Father] did not abandon the children because he has participated in some of the court hearings in this matter and has paid child support.

This appeal by Father followed.[5]

Our decision of this abuse and neglect case is guided by the following standard of review:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. pt. 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

---

[5] During the pendency of the underlying abuse and neglect proceedings, the children were placed with foster parents whose children are second cousins to the children subject to these proceedings. The permanency plan for S.H.-1 and S.H.-2 is adoption by the foster parents.

4

On appeal to this Court, Father assigns two errors: (1) the circuit court erred by terminating Father's parental rights based upon drug abuse when the evidence thereof was not clear and convincing and (2) the circuit court erred by not imposing a less restrictive disposition instead of termination. Upon a review of the record evidence, we find that the circuit court did not err in rendering these rulings.

Allegations of abuse and neglect must be proven by clear and convincing evidence to support a termination of a parent's parental rights. *See* Syl. pt. 3, *In re Christina L.*, 194 W. Va. 446, 460 S.E.2d 692 (1995) ("'"'W. Va. Code, 49-6-2(c) [1980] [now W. Va. Code § 49-4-601(i)], requires the State Department of Welfare [now the Department of Health and Human Resources], in a child abuse or neglect case, to prove "conditions existing at the time of the filing of the petition . . . by clear and convincing proof." The statute, however, does not specify any particular manner or mode of testimony or evidence by which the State Department of Welfare [Department of Health and Human Resources] is obligated to meet this burden.' Syllabus Point 1, *In Interest of S.C.*, 168 W. Va. 366, 284 S.E.2d 867 (1981)." Syllabus Point 1, *West Virginia Department of Human Services v. Peggy F.*, 184 W. Va. 60, 399 S.E.2d 460 (1990).' Syllabus Point 1, *In re Beth*, 192 W. Va. 656, 453 S.E.2d 639 (1994)."). Moreover,

> [b]ecause the purpose of an abuse and neglect proceeding is remedial, where the parent or guardian fails to respond to probative evidence offered against him/her during the course of an abuse and neglect proceeding, a lower court may properly consider that individual's silence as affirmative evidence of that individual's culpability.

Syl. pt. 2, *W. Va. Dep't of Health & Human Res. ex rel. Wright v. Doris S.*, 197 W. Va. 489, 475 S.E.2d 865 (1996).

Here, during both the adjudicatory and the dispositional hearings, Father stood silent in the face of the DHHR's allegations that he had a substance abuse addiction based upon his positive drug screen result for methamphetamine during the preliminary hearing. Given the lack of any evidence to refute or explain this test result, the circuit court did not err by construing Father's failure to testify as indicative of a substance abuse addiction. Therefore, because the positive drug screen result constituted clear and convincing evidence of Father's ingestion of methamphetamine, the circuit court did not err by adjudicating Father as abusive and neglectful on this basis. Additionally, because Father did not remedy or correct this condition of abuse and neglect by obtaining substance abuse treatment or submitting negative drug screen results, the circuit court correctly terminated Father's parental rights on this basis. *See* W. Va. Code § 49-4-604(c)(6) (permitting court to terminate parent's parental rights "[u]pon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future and, when necessary for the welfare of the child") and W. Va. Code § 49-4-604(d)(1) (finding "'[n]o reasonable likelihood that conditions of neglect or abuse can be substantially corrected' means that, based upon the evidence before the court, the abusing adult or adults

5

have demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help" and to exist when "[t]he abusing parent or parents have habitually abused or are addicted to alcohol, controlled substances or drugs, to the extent that proper parenting skills have been seriously impaired and the person or persons have not responded to or followed through the recommended and appropriate treatment which could have improved the capacity for adequate parental functioning").

Furthermore, the circuit court did not err by terminating Father's parental rights rather than imposing a less restrictive dispositional alternative, such as the legal guardianship by the foster parents that the father requested, because the best interests of the children are served by their placement with their relative foster family. *See* Syl. pt. 2, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980) ("Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, W. Va. Code, 49-6-5 (1977) [now W. Va. Code § 49-4-604] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under W. Va. Code, 49-6-5(b) (1977) [now W. Va. Code § 49-4-604(d)] that conditions of neglect or abuse can be substantially corrected."). *See also* Syl. pt. 3, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996) ("Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children.").

Accordingly, we find that the circuit court did not err by terminating Father's parental rights or by refusing to consider a less restrictive alternative disposition. Therefore, the November 17, 2020 order of the Circuit Court of Boone County is hereby affirmed.

Affirmed.

**ISSUED:** November 10, 2021

**CONCURRED IN BY:**

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison

**DISSENTING AND WRITING SEPARATELY:**

Justice William R. Wooton

WOOTON, Justice, dissenting:

In its memorandum decision, the majority upholds the termination of petitioner father J.H.'s ("petitioner") parental rights based upon allegations of abuse and neglect that simply did not exist at the time either the original or amended abuse and neglect petition was filed against him. Further, the only evidence supporting petitioner's termination of rights is a single positive drug test ordered by the circuit court at a time it had no statutory authority to do so. For these reasons, I respectfully dissent.

As a threshold matter, when the initial petition in this case is examined, it is clear that it was not legally sustainable under the relevant statutes. West Virginia Code § 49-4-601expressly provides that the contents of an abuse and neglect petition "shall allege specific conduct including time and place, how the conduct comes within the statutory definition of neglect or abuse with references to the statute, any supportive services provided by the department to remedy the alleged circumstances, and the relief sought." *Id*. § 49-4-601(b). Further, at an adjudicatory hearing, the circuit court must base any determination of whether a child is abused or neglected, and whether a respondent is an abusing parent, on the "conditions existing at the time of the filing of the petition and proven by clear and convincing evidence." *Id*. § 49-4-601(i); *accord* Syl. Pt. 6, *In re Simmons Children*, 154 W. Va. 491, 177 S.E.2d 19 (1970) ("The right to custody of children by the parents is not absolute but is founded on natural law, and in order to separate a child from its parents on the ground of unfitness of the parents there must be clear, cogent and convincing proof."). As this Court stated in *In re A.L.C.M.*, 239 W. Va. 382, 801 S.E.2d 260 (2017), "a court reviewing a petition alleging that a child has been abused and/or neglected must 'base[ ] [its findings] upon conditions existing at the time of the filing of the petition and proven by clear and convincing evidence[.]' W. Va. Code § 49-4-601(i) (2015) (Repl. Vol. 2015)[.]" 239 W. Va. at 389, 801 S.E.2d at 267; *accord* Syl. Pt. 1, *In re S.C.*, 168 W. Va. 366, 284 S.E.2d 867 (1981) ("W. Va. Code, 49-6-2(c) [1980] [now W. Va. Code § 49-4-601(i) ], requires the State Department of Welfare [now the Department of Health and Human Services], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition . . . by clear and convincing proof.' The statute, however, does not specify any particular manner or mode of testimony or evidence by which the State Department of Welfare [now the Department of Health and Human Services] is obligated to meet this burden."). Moreover, an "abused child" means "[a] child whose health or welfare is *being harmed or threatened by . . . [a] parent*, guardian, or custodian *who knowingly or intentionally inflicts, attempts to inflict*, or knowingly allows another person to inflict, physical injury or mental or emotional injury, *upon the child or another child in the home*." *Id*. § 49-1-201 (emphasis added). Additionally, "neglected child" means "a child . . . [w]hose *physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent*, guardian, or custodian *to supply the child with necessary food, clothing, shelter, supervision, medical care, or education, when that refusal, failure, or inability is not due*

7

*primarily to a lack of financial means on the part of the parent, guardian, or custodian*[.]"
*Id.* (emphasis added).

Here, at the time the original abuse and neglect petition was filed against petitioner, the children did not live with him. Rather, the evidence established that the children were staying with the maternal grandfather in West Virginia, although there was no court order granting the grandfather custody of the children. Petitioner, who was not married to the children's mother, resided in the Commonwealth of Kentucky.

Petitioner had traveled to West Virginia at the mother's request after she was released from the hospital due to her drug abuse issues. The mother asked petitioner to drive to the grandfather's home in Boone County, West Virginia, and assist her in retrieving the children, who had been staying with the grandfather during her hospitalization. The grandfather refused to give the mother the children back after the mother's release from the hospital because he did not want the children to be taken to Kentucky where, he claimed, he could not ensure their safety. As noted, there was no court order placing custody of the children with the grandfather. There was a physical altercation between petitioner and grandfather, which resulted in petitioner's arrest. Critically, the evidence shows that the physical altercation did not take place in the children's presence.

A petition for abuse and neglect was filed against the mother and petitioner. The Department of Health and Human Resources ("DHHR") alleged that "there were no reasonable and effective alternatives to removing the children from the home[,]" based on the fact that the Child Protective Services ("CPS") worker did not believe the children were safe with their mother or petitioner "because of violence, abuse of illegal substances, erratic behavior and mental instability." Critically, in the Initial Order Upon Filing of Petition, the emergency removal petition, there were no findings made by the circuit court in regard to petitioner.

In a similar vein, at the preliminary hearing there were no allegations or evidence of abuse and neglect concerning petitioner. The investigating CPS worker testified that the children were not present during the altercation between petitioner and the grandfather and admitted there was no evidence that the children had been exposed to any illegal drug abuse by petitioner. There was also an acknowledgement that because one or both of the children's parents had their custodial rights to the children, the petition may have been "prematurely filed," which highlighted the lack of evidence against petitioner in the case. Because of the lack of allegations of abuse and neglect against petitioner at the time the petition was filed and because the DHHR did not prove that either of the children were abused or neglected by petitioner, the petition against him should have been dismissed. This did not occur. Instead, the circuit court ordered petitioner to submit to a drug test. The results of this drug test came back positive for methamphetamine, amphetamines, and

8

possibly marijuana and ecstasy.[6] This single drug test caused the DHHR to file an amended abuse and neglect petition against petitioner wherein it was alleged that he had a failed drug screen – a screen which occurred after the DHHR had assumed legal custody of the children, and in the absence of any allegations that petitioner had abused drugs in the children's presence or that his drug use had impaired his ability to parent his children.[7] On the basis of this single drug screen, the DHHR made a sweeping allegation that petitioner "has demonstrated through his conduct [a single positive drug screen] that his purpose is to forego the duties and parental responsibilities to the children[.]"

The circuit court erred in allowing the DHHR to amend the abuse and neglect petition following this positive drug screen where no prior allegations of petitioner's drug use in the context of the abuse and neglect proceeding existed at time the "conduct" giving rise to the abuse and neglect petition was filed. Put simply, the DHHR was allowed to assert an "allegation" of abuse and neglect – a single positive drug screen – that it simply had no evidence of when the abuse and neglect petition was filed. In regard to petitioner and his children, the children did not meet the statutory definition of either abused or neglected children because the DHHR lacked evidence that petitioner was an abusing parent. *See* W. Va. Code § 49-1-201 (defining "abusing" parent). Yet the circuit court allowed a single positive drug screen to fill the dearth of evidence in this case. This is a backwards application of our abuse and neglect statutes that is legally flawed and should have resulted in a reversal of the circuit court's dispositional order in regard to petitioner. However, the majority ignored this glaring legal error and exacerbated it by upholding the circuit court's decision.

Second, in addition to the legally flawed abuse and neglect petition, there was also insufficient evidence propounded by the DHHR to warrant the circuit court's termination of petitioner's parental rights. Again, the *only* evidence against petitioner was a single positive drug test. Specifically, the circuit court found that petitioner "tested positive for methamphetamine and marijuana. . . ." Even though the circuit court also found that petitioner had failed to submit to any other drug screens, the parties acknowledge that the appendix record fails to contain any order directing petitioner to submit to additional drug screens or any requests by DHHR for him to submit to any drug screens. The circuit court also found that petitioner did not complete substance abuse treatment of any kind, and it inferred from his failure to testify at the dispositional hearing that "he did not want to testify

---

[6] When petitioner's counsel informed the court that petitioner had a prescription for Adderall, the circuit court immediately rejected the notion that this drug may have caused him to test positive for the substances found in his drug screen, stating, in the absence of any evidence, "Adderall does not show up as methamphetamine."

[7] The amended petition also contained an allegation that petitioner had abandoned his children. In regard to abandonment, the circuit court found that petitioner "did not abandon the children because he has participated in some of the court hearings in this matter and has paid child support."

about his substance abuse." The circuit court found in its dispositional order based on this single drug test that petitioner "has habitually abused and is addicted to controlled substances or drugs, to the extent that proper parenting skills have been seriously impaired and that . . . [petitioner] has not responded to or followed through recommended and appropriate treatment which could have improved the capacity for adequate parental functioning."

In deciding to terminate petitioner's parental rights, the circuit court wholly ignored the fact that petitioner lives in Kentucky where he works full time and it would have been impossible for him to participate in family drug court as the circuit court desired.[8] Moreover, while it was not legally improper for the circuit court to consider petitioner's silence in regard to his positive drug screen as affirmative evidence of his culpability,[9] it should not be considered proof of anything more. This Court was clear in its holding in *Doris S.* that a parent's failure to respond to "probative evidence" offered against him may be considered evidence of his culpability. 197 W. Va. at 492, 475 S.E.2d at 868, Syl. Pt. 2. In this regard, the only "probative evidence" of petitioner's drug use was a single drug test. This single drug screen hardly supports a finding of habitual drug abuse.

According to the provisions of West Virginia Code § 49-4-604(d)(1),

> "[n]o reasonable likelihood that conditions of neglect or abuse can be substantially corrected" means that, based upon the evidence before the court, the abusing adult . . . ha[s] demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own with help. Those conditions exist in the following circumstances . . . (1) [t]he abusing parent . . . ha[s] habitually abused or are addicted to alcohol, controlled substances or drugs, to the extent that proper parenting skills have been seriously impaired and the person or persons have not responded to or followed through the recommended and

---

[8] During questioning of petitioner's counsel at a status hearing in December of 2019, when the circuit court suggested family drug court to the parties, it stated its position that petitioner needed to participate in drug court or seek separate drug treatment or have his parental rights litigated. The court stated: "The petition is kind of weak, but when you come here for a prelim and fail for meth, you are going to lose unless you want some type of treatment. It is as simple as that."

[9] *See* Syl. Pt. 2, *W. Va. Dep't of Health & Human Res. ex rel. Wright v. Doris S.*, 197 W. Va. 489, 475 S.E.2d 865 (1996) ("Because the purpose of an abuse and neglect proceeding is remedial, where the parent or guardian fails to respond to probative evidence offered against him/her during the course of an abuse and neglect proceeding, a lower court may properly consider that individual's silence as affirmative evidence of that individual's culpability.")

> appropriate treatment which could have improved the capacity
> for adequate parental functioning[.]

The DHHR failed to carry its burden of proving, with a single positive drug screen, that petitioner either "habitually abused" drugs or was addicted to controlled substances such that it seriously impaired his parenting skills. *Id.* Further, the DHHR offered no evidence as to how a single drug screen seriously impaired petitioner's ability to parent when the children were not residing with petitioner when the allegations against him arose. The majority fails to address this necessary evidence required to support the circuit court's determination that there was "no reasonable likelihood that conditions of neglect or abuse can be substantially corrected." The reason is that the record is devoid of such evidence.

In summary, the DHHR's evidence was insufficient to support the circuit court's dispositional decision to terminate petitioner's parental rights. The majority's decision to affirm the circuit court in this regard is unfair, unjust, and clearly wrong as a matter of law.

For the foregoing reasons, I respectfully dissent.