**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**FILED**

**May 30, 2024**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

*In re* **L.B.-1 and L.B.-2**

**No. 22-906** (Logan County Case Nos. CC-23-2022-JA-27 and CC-23-2022-JA-28)

## MEMORANDUM DECISION

The guardian ad litem[1] ("GAL") of L.B.-1 and L.B.-2[2] appeals the Circuit Court of Logan County's November 23, 2022, adjudicatory order dismissing the underlying child abuse and neglect petition, finding that the West Virginia Department of Human Services ("DHS")[3] did not prove that respondent mother L.B.-3 ("respondent") was an abusing parent by clear and convincing evidence. The instant petition was filed against respondent after L.B.-2—a two-and-a-half-month-old infant who resided with respondent, his sibling L.B.-1, and his maternal grandparents—was diagnosed with a skull fracture and subdural and retinal hemorrhages immediately following a day partially spent with a childcare provider. The circuit court found that DHS failed to establish that respondent perpetrated the abuse and/or that she knew or should have known that abuse had previously or may occur. The GAL appeals, arguing that the best interests of the children preclude dismissal of the petition where the perpetrator of L.B.-2's unexplained, non-accidental injuries has not been identified.

This Court has now carefully considered the briefs and oral arguments of the parties, the submitted record, and the pertinent authorities. Upon review and under the particular facts and

---

[1] Counsel Lena Donna Pratt appears as the children's guardian ad litem. Respondent mother, L.B.-3, appears by counsel Alan L. Pritt, Pritt & Spano. The West Virginia Department of Human Services appears by counsel Attorney General Patrick Morrisey, Assistant Solicitor General Frankie Dame, and Assistant Attorney General Heather L. Olcott. Respondent father M.W. appears by counsel Anna L. Adkins, Hardy Pence PLLC.

[2] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e). Further, because the children and respondent mother share the same initials, we use numbers to differentiate them.

[3] Pursuant to West Virginia Code § 5F-2-1a, the agency formerly known as the West Virginia Department of Health and Human Resources was terminated. It is now three separate agencies—the Department of Health Facilities, the Department of Health, and the Department of Human Services. *See* W. Va. Code § 5F-1-2. For purposes of abuse and neglect appeals, the agency is now referred to as the Department of Human Services.

circumstances presented herein, we find no error in the circuit court's dismissal of the underlying petition. Because there is no substantial question of law and no prejudicial error, a memorandum decision is appropriate pursuant to Rule 21 of the West Virginia Rules of Appellate Procedure.

## I. Factual and Procedural History

At the time the underlying petition was filed respondent and the subject children lived with respondent's parents (the "grandparents") in their home in Chapmanville, West Virginia. According to evidence adduced at adjudication, on March 18, 2022, respondent awoke, fed two-and-a-half-month-old L.B.-2, and left for work at about 7:30 a.m., leaving him and three-and-a-half-year-old L.B.-1 with the grandparents. Around 10:30 a.m., the grandparents took the children to the home of a childcare provider (the "babysitter") who has cared for children in her home for approximately forty years and had previously cared for L.B.-1 since his infancy. Respondent testified that the babysitter had been caring for L.B.-2 for approximately one to two weeks, beginning shortly after her maternity leave ended.[4] In addition to the subject children, the babysitter was also caring for another toddler and infant at the time.

The grandparents arrived to retrieve the children at approximately 4:00 p.m. and the grandfather walked to the babysitter's porch to pick them up. When L.B.-2 was presented already in his car seat, the grandfather noted that he was shaking his head back and forth and/or was "shivering"; at the time he surmised this may have been due to the sun shining in his eyes. The grandfather testified that he mentioned it to the grandmother upon entering the car and they returned home, where L.B.-2 continued sleeping. Around 6:00 p.m., the grandmother tried to wake L.B.-2 to feed him and he projectile vomited.

Upon leaving work respondent had a hair appointment, after which she returned home between 7:30 and 8:00 p.m.[5] Respondent testified that she was greeted as usual by L.B.-1, went directly to L.B.-2's bassinet, and knew "immediately" something was wrong with him. Respondent testified that his color was "grey" and, while typically alert and tracking movements with his eyes, L.B.-2 would not look at her and his eyes were fixed. She testified that she advised her parents that he needed to go to CAMC Women and Children's emergency room, and she and the grandmother took him immediately. Respondent testified that, initially, providers at CAMC maintained that L.B.-2 was suffering from a virus and that she insisted on additional testing. A CT scan revealed that L.B.-2 had sustained a brain bleed and skull fracture; he was then transported to Ruby Memorial Hospital in Morgantown, West Virginia, via ambulance. At Ruby Memorial, an MRI revealed bilateral subdural hematomas with "varying ages" of hemorrhage, indicating multiple injuries in various stages of healing. In addition, physicians noted retinal hemorrhages "too numerous to count[.]" His injuries were determined to be non-accidental. During their

---

[4] The babysitter, however, testified that she had been caring for L.B.-2 for a slightly longer period of time—since March 1, 2022.

[5] The grandfather testified that the grandmother called respondent to advise of L.B.-2's vomiting, but the grandmother and respondent deny that respondent was informed of any issues prior to returning home. The grandmother testified that she did not believe his symptoms were so urgent that they could not wait until respondent returned home.

2

investigation of L.B.-2's injuries, a Child Protective Services ("CPS") worker interviewed L.B.-1 and inquired as to why L.B.-2 was in the hospital; L.B.-1 stated that L.B.-2 was drinking a bottle and fell off the couch at the babysitter's house and that she "scooped him up."

An abuse and neglect petition was filed on March 24, 2022, against respondent;[6] the children were removed and placed with respondent M.W., who was designated as non-offending.[7] At the April 7, 2022, preliminary hearing, testimony was taken from Dr. Vincent Arnone, a neurologist at Ruby Memorial who treated L.B.-2. Dr. Arnone testified that L.B.-2 had multiple hematomas of varying ages and a skull fracture that was caused by "high velocity" forces indicative of child abuse. He testified that the injuries were not consistent with a fall from a couch and the only accidental cause he could project with sufficient force to cause such injuries would be a car accident, a fall down multiple flights of stairs, or a fall from a height of six to eight feet. He opined that the retinal hemorrhages were caused by "repeated movements" such as shaking a child. He also testified that over the skull fracture area there was a "goose egg" that would have been visible. And while he did confirm the existence of older, healing injuries, he was not questioned about the age of the older injuries or what symptoms they may have elicited.[8] A CPS

---

[6] Neither DHS nor the GAL explain why neither the grandparents nor the babysitter were named in the petition, contrary to the directives of West Virginia Code § 49-4-601(b) (2019): "Each petition shall name as a party each parent, guardian, custodian, other person standing *in loco parentis* of or to the child allegedly neglected or abused and state with specificity whether each parent, guardian, custodian, or person standing *in loco parentis* is alleged to have abused or neglected the child." *See id*. § 49-1-204 (defining "[c]ustodian" as "a person who has or shares actual physical possession or care and custody of a child, regardless of whether that person has been granted custody of the child by any contract or agreement."). *See also, e.g, In re Z.S.-1,* 249 W. Va. 14, ___, n.16, 893 S.E.2d 621, 629 n.16 (2023) (noting erroneous dismissal of non-biological parent who resided in the home with the subject children and whose "cognizable rights as the child's guardian and/or custodian" were properly subject to termination under statute); *In re Bryanna H*., 225 W. Va. 659, 669, 695 S.E.2d 889, 899 (2010) (finding non-biological father who resided in home with mother and children a "custodian" for purposes of abuse and neglect proceedings).

Further, DHS represents in its brief that a criminal investigation into the underlying matter has been closed and that "no one, including [respondent], would cooperate with law enforcement." However, the appendix record is devoid of any meaningful information regarding the existence or outcome of any such criminal investigation.

[7] When CPS workers interviewed respondent M.W. he testified that he and respondent were involved in a custody case and that he had been given only thirty minutes visitation in the car once a week with L.B.-2 because the baby was premature and had recently been hospitalized for two weeks for "lung problems." He had most recently seen L.B.-2 three weeks prior to the events alleged in the petition.

[8] At adjudication, the grandmother testified that a doctor told her the acute skull fracture injuries could have happened twenty-four to forty-eight hours prior to the manifestation of symptoms; however, there was no testimony to this effect from Dr. Arnone or any other expert.

worker testified to the circumstances surrounding the petition and confirmed that the babysitter had no prior CPS complaints. At the close of the hearing, the court ordered the children to remain in M.W.'s custody with visitation for respondent, with no one other than the visitation supervisor present.[9]

Approximately three weeks before adjudication the GAL filed an emergency motion to suspend respondent's visitation because respondent 1) repeatedly allowed the grandmother to attend visits contrary to the circuit court's order; 2) continually violated the terms of the visitation by speaking with L.B.-1 about returning home; and 3) made repeated, unfounded complaints about the children's hygiene. At the hearing on the motion, CPS workers confirmed that respondent repeatedly made allegations that the children had diaper rash and were unclean, contrary to the observations of multiple service providers and workers. DHS represented that L.B.-1 had begun to vomit prior to and after visits with respondent. Accordingly, the circuit court suspended respondent's visitation pending adjudication.

On June 6, 2022, the court held an adjudicatory hearing during which respondent, the grandparents, the babysitter, and M.W. testified. Respondent testified to the events as indicated above, insisting that L.B.-2 was "perfectly fine" when she left for work and that the grandparents would "never" harm L.B.-2. As to her position on L.B.-2's injuries, respondent testified that "I honestly believe an accident happened while he was at the sitter's. I don't know what happened. I wish I knew what happened." She elaborated that the babysitter sent her two, unsolicited photos of L.B.-2 lying on the couch stating, "sound asleep on the couch with mammie, full belly, dry bottom"; she opined that the photos and message were "[the babysitter's] way of covering up [that] something happened." When questioned about the fact that L.B.-2 had multiple, healing injuries, respondent posited two potential explanations: that she had undergone an emergency C-section while delivering L.B.-2 and that he was diagnosed with a "blood deficiency."[10]

The babysitter denied harming L.B.-2 or noticing any problems with him; she testified that L.B.-2 was the same as the day before, ate at his regular times, and was otherwise normal. The grandparents likewise denied harming L.B.-2. The grandfather, after initially denying knowing how L.B.-2 was injured, testified that "[L.B.-2] was at the babysitter's when he got hurt, I know that for sure." The grandmother testified that "I really don't believe it was intentional. I believe an accident has happened." When M.W. was asked whether he believed it was possible L.B.-2 was injured while in respondent's care, he responded "definitely" but did not elaborate.

---

[9] Following the preliminary hearing, the circuit court entered an order requiring respondent to undergo a psychological and parental fitness evaluation at a date and time to be determined. That evaluation was apparently scheduled for June 13, 2022—approximately one week after the June 6 adjudicatory hearing; respondent did not attend the evaluation. At a hearing prior to adjudication, the circuit court recognized that the scheduled evaluation would post-date the adjudicatory hearing but stated that it was not "fair to push this adjudication . . . outside of abuse and neglect suggested timeframes all while the parent is requesting a timely hearing."

[10] Respondent later specified that a hematologist advised he may have a "platelet disorder" or "blood clotting disorder."

In its November 23, 2022, adjudicatory order,[11] the circuit court concluded that DHS had not proven by clear and convincing evidence that respondent was an abusing parent and dismissed the petition "with hesitancy[.]" In examining the evidence against respondent, the court found that there was no evidence respondent committed the abuse herself or was "anything less than an appropriate caregiver[.]" As to respondent's knowledge of any potential abuse by others, the court found that there was no evidence "that allow[ed] for the attributing of knowledge of risk or overall fault" to respondent and that without "some act or inactions, some act with knowledge at the hands of [respondent]" it could not "fairly or appropriately" adjudicate her. Analyzing our caselaw where parents were adjudicated under similar circumstances, the circuit court distinguished ostensibly dispositive elements in those cases by noting that respondent "identified the babysitter as the abuser," sought immediate medical attention for L.B.-2, and cooperated with the investigation. Three days after orally announcing its adjudicatory ruling, DHS moved for a stay of the dismissal, which the circuit court granted. This appeal by the GAL followed.

## II. Standard of Review

On appeal from a final order in a child abuse and neglect proceeding, this Court reviews the circuit court's findings of fact for clear error and its conclusions of law de novo. Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011). "A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Syl. Pt. 1, in part, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996). However, this Court "may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." *Id.*, in part.

## III. Discussion

The GAL—joined by DHS and respondent M.W.—argues that the children's best interests require reversal of the circuit court's dismissal of the petition because L.B.-2's abuser remains unidentified. They highlight what they characterize as inconsistencies in the testimony at adjudication, contending that these discrepancies suggest some degree of respondent's culpability for L.B.-2's abuse. Failing that, however, they contend that respondent should have been adjudicated, at a minimum, as neglectful given that she was L.B.-2's custodial parent. Specifically, the GAL urges that the facts "support[] entry of an order of neglect rather than a dismissal," maintaining that the circuit court failed to "appropriately apply[] the definition of neglect[.]" Likewise, respondent M.W. asserts that L.B.-2 "did not receive proper supervision" pursuant to the definition of a "neglected child" contained in West Virginia Code § 49-1-201 (2018)[12] and

---

[11] The circuit court held a hearing to announce its ruling on June 28, 2022; however, the adjudicatory order was not entered until nearly six months later. *See* W. Va. R. P. Child Abuse & Neglect Proc. 27 (requiring entry of adjudicatory order "within ten (10) days of the conclusion of the hearing").

[12] West Virginia Code § 49-1-201 defines "[n]eglected child," in part, as "a child . . . [w]hose physical or mental health is harmed or threatened by a present refusal, failure or inability (continued . . .)

5

DHS contends that there was sufficient evidence to adjudicate respondent "as an abusive *or neglectful* parent." (Emphasis added).[13] Respondent argues generally in support of the circuit court's order.

We find it appropriate to first clarify the nature of the allegations contained in the underlying petition. The petition does not allege that L.B.-2 was a "neglected" child under the statutory definition, nor does it contain any reference to or allegations of failure to supervise or protect as against respondent. Instead, it exclusively alleges "maltreatment" of L.B.-2, detailing the facts and circumstances surrounding his acute head injury, as well as the healing injuries suggestive of prior abuse. *See In re A.L.C.M.*, 239 W. Va. 382, 391, 801 S.E.2d 260, 269 (2017) (stating that petition must demonstrate how alleged conduct "comes within the statutory definition" of abuse or neglect); W. Va. Code § 49-4-601(b) (2019) ("The petition shall allege specific conduct including time and place, [and] how the conduct comes within the statutory

---

of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, supervision, medical care, or education, when that refusal, failure, or inability is not due primarily to a lack of financial means on the part of the parent, guardian, or custodian[.]"

[13] During oral argument, DHS expounded on this position by arguing that even if "neglect" was not adequately alleged in the petition, the circuit court erred in not requiring amendment of the petition under our caselaw. *See* Syl. Pt. 5, *In re Randy H.*, 220 W. Va. 122, 640 S.E.2d 185 (2006) (describing circuit court's inherent authority to require amendment of the petition under Rule 19 where "additional abuse or neglect has occurred . . . which is not encompassed by the allegations" in the petition).

We draw two distinctions between this precedent and the instant case. First, despite DHS now insisting that this Court read between the lines of the petition to find neglect sufficiently alleged, at no time below did it move to amend the petition to assert failure to protect or supervise—nor did any party request the circuit court to order amendment. Secondly, our reference to the circuit court's inherent power to require amendment of a petition has ordinarily been invoked where there are new or additional allegations of abuse or neglect, rather than an attempt to "retrofit" the petition to the evidence or lack thereof. *See In re Lilith H.*, 231 W. Va. 170, 181, 744 S.E.2d 280, 291 (2013) (finding error where circuit court denied GAL's motion to compel DHS to amend its petition to include new allegations regarding the condition of the children and the home not contained in original petition); *see also In re C.L.*, 249 W. Va. 95, ___, 894 S.E.2d 877, 884 (2023) ("[I]f, during the course of the proceeding, the circuit court has reason to believe that *additional* abuse or neglect has occurred which was not alleged in the original petition, then it has the inherent authority to compel DHHR to amend its petition to encompass the *additional evidence or allegations*[.]" (emphasis added)).

Importantly, however, even if the subject petition were construed as alleging failure to protect or supervise, the circuit court affirmatively concluded that DHS presented no evidence to establish that respondent had any reason to believe that the grandparents or the babysitter were anything other than appropriate caregivers and therefore committed no act of "neglect." *See* discussion, *infra*.

6

definition of neglect or abuse with references to the statute[.]").[14] Therefore, the circuit court's findings must be examined against the exclusive allegations of abuse against respondent contained in the underlying petition.

West Virginia Code § 49-1-201 defines an "[a]bused child," in part, as one whose health or welfare is harmed or threatened by "[a] parent, guardian, or custodian who knowingly or intentionally inflicts, attempts to inflict, or knowingly allows another person to inflict, physical injury or mental or emotional injury, upon the child or another child in the home." The Court has clarified that "knowingly"—as pertains to abuse inflicted by others—"does not require that a parent actually be present at the time the abuse occurs, but rather that the parent was presented with sufficient facts from which he/she could have and should have recognized that abuse has occurred." Syl. Pt. 7, in part, *W. Va. Dep't of Health & Hum. Res. ex rel. Wright v. Doris S.*, 197 W. Va. 489, 475 S.E.2d 865 (1996).

In their assignments of error, the GAL, DHS, and respondent M.W. primarily emphasize the "unidentified" nature of L.B.-2's abuser and the theoretical resultant danger posed by the circuit court's dismissal of the petition and the children's impending return to the home.[15] In that regard, they appear to suggest the court abdicated its role as factfinder in this case at the expense of the children's safety. These positions are buttressed by both the circuit court's hesitancy to dismiss the petition and its expressed discomfort with the probative quality of evidence during adjudication.

For instance, in its adjudicatory order, the circuit court equivocates about the "more likely" perpetrator, lamenting that "someone is lying here," but that "the babysitter or grandparents may be seen as *more probable* due to their periods of unsupervised caretaking immediately prior to the child's manifestation of serious symptoms of injury." The order then immediately proceeds to narrow down those possibilities "finding" the babysitter "*more likely the abuser* than the grandparents due to testimony of the grandfather who observed rapid head turning back-and-forth from what he thought was perhaps the sun[.]" (Emphasis added). Reluctantly crediting the babysitter's unblemished 40-year history of childcare and with the caveat that her culpability could not be proven by clear and convincing evidence, the circuit court nonetheless concludes that "there is simply no more reliable evidence to attribute fault elsewhere."

In addition to these frustrations, the circuit court further commented on the absence of evidence which may ordinarily "tip the scale" and permit a more definitive finding. In particular, the order notes the absence of any "compelling evidence to suggest that any of the witnesses heard at the adjudicatory hearing [were] any more or less credible than the others[]" because none of the witnesses "exhibited any emotions as they testified." Further, the court commented on the lack of contextual evidence regarding the older injuries, including the absence of medical evidence

---

[14] In that regard, any reliance on the factual similarity of *In re P.H.*, No. 20-0728, 2021 WL 982804, *2 (W. Va. Mar. 16, 2021) (memorandum decision) is unavailing because adjudication in that matter was premised upon DHS's assertion of a failure to supervise. *See infra.*

[15] The Rule 11 updates provided in this matter indicate that respondent has obtained her own housing and no longer resides with the grandparents. *See* W. Va. R. App. P. 11(j).

regarding whether "any of the supposed older injuries would have showed symptoms[]" or "a particular range of dates or on a particular time" of the prior injuries "so as to fairly attribute those prior injuries" among the potential perpetrator(s).[16]

However, despite its equivocation and misgivings about dismissal of the petition without a more definitive identification of the abuser, the circuit court made one thing clear: it determined that *respondent* was neither the perpetrator of the abuse nor had any reason to suspect that abuse had or may occur at the hands of the grandparents or the babysitter. The court expressly found no evidence that respondent was "anything less than an appropriate caregiver," and noted the complete absence of evidence that she "failed to act appropriately in any way." Throughout its order, the court repeatedly emphasized that it "d[id] not know what more" respondent could have done to ensure that the grandparents and the babysitter were appropriate caregivers. These findings plainly demonstrate that the circuit court narrowed the potential abuser(s) to the grandparents or the babysitter, thereby finding credible and accepting respondent's denials of abuse or knowledge of any prior or potential abuse. This Court must affirm these findings because they are "plausible in light of the record viewed in its entirety." *In re Tiffany Marie S.*, 196 W. Va. at 226, 470 S.E.2d at 180, syl. pt.1, in part.

In accordance with our standard of review, we find that the GAL, DHS, and respondent M.W. identify no evidence regarding respondent's actions which would demonstrate that the circuit court clearly erred in its refusal to adjudicate her as abusive. The GAL urges that minor inconsistencies between respondent's and the witnesses' testimony casts doubt upon respondent's credibility in her denial of perpetrating and/or permitting said abuse. However, despite disclaiming any credibility determinations, the circuit court's refusal to find any culpability on respondent's part demonstrates that any ostensible inconsistencies in the testimony adduced at adjudication were resolved in her favor. Regardless of how they are expressed in the adjudicatory order, these are affirmative, adjudicative findings to which this Court owes deference. We have stated that "'[w]hen findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings[.]'" *In re Tiffany Marie S.*, 196 W. Va. at 231, 470 S.E.2d at 185 (quoting *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 574 (1985)) (citations omitted).

The GAL, DHS, and respondent M.W. further argue that the circuit court erred in its analysis of factually similar cases leading to the erroneous dismissal of the petition. This Court has indeed had several occasions to address adjudication of parents where undisputed abuse of pre-verbal infants who were exposed to multiple caregivers occurred. In those cases, however, the particular facts revealed distinctions that supported the lower courts' credibility and adjudicative

---

[16] In this regard, DHS argues that the circuit court erred in focusing its analysis on the timeframe immediately surrounding L.B.-2's acute skull fracture, rather than a broader timeframe that would encompass the older injuries or at least a longer time period preceding the skull fracture. However, as the circuit court notes, and DHS concedes in its brief, no testimony was elicited from Dr. Arnone about the age of the other injuries or how long it would have taken the skull fracture symptoms to manifest.

findings, such as silence of the caregivers,[17] failure to investigate or seek medical care for presumptive injuries,[18] or refusal to acknowledge abuse.[19] For example, in *Doris S.*, we held that "[i]mplicit in the definition of an abused child under West Virginia Code § 49-1-3 (1995) is the child whose health or welfare is harmed or threatened by a parent or guardian who fails to cooperate in identifying the perpetrator of abuse, rather choosing to remain silent." 197 W. Va. 492, 475 S.E.2d 868, syl. pt. 1. Here, however, the circuit court noted that respondent identified the babysitter as the likely perpetrator,[20] "has cooperated with the investigation[,] and at every

---

[17] *See, e.g., Doris S.*, 197 W. Va. 489, 475 S.E.2d 865.

[18] *See, e.g., In re C.W.*, No. 15-0293, 2015 WL 7628797 (W. Va. Nov. 23, 2015) (memorandum decision) (affirming termination where medical evidence demonstrated prior, non-accidental subdural bleeds occurred over a six-month period of time, would have been symptomatic, and parents sought no treatment).

[19] *See, e.g., In re P.H.*, 2021 WL 982804, at *6 (noting parent "failed to acknowledge that *any* physical abuse occurred" (emphasis added)); *In re Taylor B.*, 201 W. Va. 60, 491 S.E.2d 607 (1997) (affirming termination where parents each denied abuse occurred).

[20] We are careful to note that mere "scapegoating" has been found inadequate to "identify" a perpetrator. In syllabus point three of *In re Jeffrey R. L.*, we held that parental rights may be terminated where a child has suffered extensive physical abuse and "the parents, even in the face of knowledge of the abuse, have taken no action to identify the abuser." 190 W. Va. 24, 435 S.E.2d 162 (1993). In that case, a caretaker grandparent alleged that the father admitted to the abuse, however, that allegation was ultimately found non-credible and therefore insufficient to "identify" the perpetrator. *Id.* at 34, 435 S.E.2d at 172.

Similarly, in *In re P.H.*, the circuit court adjudicated petitioner mother as abusive where the parents cast potential blame on a great-grandmother who briefly watched the child. 2021 WL 982804, at *1-2. The circuit court found that "petitioner testified that she suspected that R.H. could have caused the injuries," but "this did not amount to a definitive identification of the child's abuser." *Id.* at *4. In discounting petitioner's mere speculative identification of a suspect, this Court agreed that "[s]imply suggesting that R.H. could have caused the injuries, *without more*, is insufficient to show that petitioner identified the abuser[.]" *Id.* at *6 (emphasis added). *See also In re Harley C.*, 203 W. Va. 594, 601, 509 S.E.2d 875, 882 (1998) (rejecting "blanket conclusions" casting blame for abuse on others without evidence of demonstrable efforts to identify perpetrator of abuse).

In the instant case, we find that the circuit court was presented with more than a mere "suggestion" that the babysitter was the perpetrator. There were well-developed facts and circumstances surrounding the time period during which L.B.-2 was in each caregiver's care, along with temporal symptomatic evidence—all of which arguably supported respondent's identification of the babysitter as the potential perpetrator of, at a minimum, the acute head injury sustained by L.B.-2.

hearing has expressed she will fully cooperate and participate in this case."[21]  We find nothing in our precedents which renders the circuit court's ruling erroneous under the specific facts and circumstances of this case.

We commend the GAL's pursuit of this appeal in the interests of advocating for and protecting the safety of the subject children.  However, we cannot agree that a bald assertion of the children's "best interests" may be used to require the circuit court to adjudicate respondent as abusive where the evidence below was simply insufficient to do so.  Without undermining the force of our edict that "the best interests of the child is the polar star by which decisions [affecting them] must be made," we have expressed a critical limitation in that regard.  *Michael K.T. v. Tina L.T.*, 182 W. Va. 399, 405, 387 S.E.2d 866, 872 (1989).  Following the guidance of the United States Supreme Court, we have previously explained that,

> the best interests of the child do not become paramount until the child's parents are found to be unfit.  Until that time, the best interests of the parents and children are presumed to be the same.  As the Supreme Court said in *Santosky*, it is not until "[a]fter the State has established parental unfitness . . . that the interests of the child and the natural parents do diverge. . . .  [U]ntil the State proves parental unfitness, the child and his [or her] parents share a vital interest in preventing erroneous termination of their natural relationship." 455 U. S. at 760, 102 S. Ct. 1388 (footnote omitted).  Indeed, if a parent's unfitness did not have to be shown prior to considering a child's best interests, the State could simply dispense with due process procedures and simply remove children from fit parents who may be poor or uneducated and place them with fit parents who may be more affluent and or better educated based on the State's belief that it knows what is best for a child.

*In re K.L.*, 233 W. Va. 547, 554, 759 S.E.2d 778, 785 (2014).

Further, this Court whole-heartedly agrees with the grave concern over the lack of a more satisfying determination about who perpetrated these horrific acts of abuse upon L.B.-2.[22]  However, it is axiomatic that "the burden of proof in a child neglect or abuse case does not shift

---

[21] Further, the circuit court did not find respondent's alternate explanations for L.B.-2's older injuries to be so implausible as to be tantamount to a denial of or refusal to acknowledge abuse.  The order notes that while respondent provided alternate causes that were "seemingly unlikely and perhaps unsupported by any evidence[,]" they were "still yet potentially plausible."

[22] In that regard, the Court notes that the parties have represented that the grandparents attend certain of respondent's supervised visits with the subject children; because of the children's removal, presumably the children have had no occasion to require the babysitter's services.  In view of the circumstances herein, the Court would be remiss in failing to caution respondent regarding the particular challenges attendant to her duty to protect and supervise the subject children going forward, in light of the undetermined identity of the perpetrator of the abuse on L.B.-2.

from [DHS] to the parent, guardian or custodian of the child. It remains upon the [DHS] throughout the proceedings." Syl. Pt. 2, in part, *In re S.C.*, 168 W. Va. 366, 284 S.E.2d 867 (1981). To find the mere lack of definitive identification of L.B.-2's abuser sufficient to adjudicate respondent as abusive—in absence of any clear and convincing evidence satisfying the statutory definition—would effectively require her to prove she did *not* abuse L.B.-2. We have expressly cautioned against such rulings because "shifting the burden of proof to [a parent] to show that [he or she] did not neglect and or abuse [a child] is not a mere procedural irregularity, but rather a constitutional due process error." *In re K.L.*, 233 W. Va. at 554, 759 S.E.2d at 785; *see* Syl. Pt. 1, *In re Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973) ("In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.").

## IV. Conclusion

For the foregoing reasons, we find no error in the decision of the circuit court, and its November 23, 2022, order is hereby affirmed.

Affirmed.

**ISSUED**: May 30, 2024

**CONCURRED IN BY**:

Justice Elizabeth D. Walker
Justice John A. Hutchison
Justice William R. Wooton
Justice C. Haley Bunn

**DISSENTING:**

Chief Justice Tim Armstead

ARMSTEAD, Chief Justice, dissenting:

This case presented both the circuit court and our Court with a difficult choice, balancing the right of a child to be removed from an abusive situation against a parent's right to maintain custody of his or her child. While I believe the record reflects that the circuit court struggled with these competing interests, and I respect the court's efforts to reach the right conclusion in a very difficult case, I dissent because I believe the facts and the applicable law support a different result.

L.B.-2 was born in January 2022. Within the first seventy-five days of his life, while he was in the primary custody of his mother, L.B., L.B.-2 suffered critical, non-accidental injuries. A petition seeking immediate custody of L.B.-2 and his older brother, L.B.-1, was filed in March

11

2022, and on the same day, the circuit court entered an Emergency Order finding that the physical well-being of both children "would be in imminent danger if they were to remain in the legal custody of [their mother]." The legal and physical custody of the children was transferred to the West Virginia Department of Health and Human Resources (hereinafter "DHS"), and the children were placed in the custody of their father, M.W.

Despite the circuit court's initial finding that these children would be in imminent danger if they were to remain with their mother, the petition was dismissed approximately three months later after the circuit court concluded that the DHS failed to establish that the mother was an abusing parent.[23]

In its decision affirming the circuit court, the majority cites the failure of the DHS to amend its petition and the failure of any other party to request that the petition be amended to allege neglect or make allegations of failure to supervise or protect. Despite the DHS' failure to amend the petition below, I believe the detailed petition filed in this action adequately alleged that the petitioner's actions constituted a failure to protect or supervise L.B.-2. The petition outlines, in exhaustive detail, the injuries suffered by L.B.-2 while in the custody of petitioner. Pursuant to West Virginia Code § 49-1-201, a "Neglected Child" is defined, in pertinent part as follows:

> "Neglected child" means a child:
>
> (A) Whose physical or mental health is harmed or threatened by a present refusal, *failure or inability of the child's parent*, guardian, or custodian *to supply the child with necessary* food, clothing, shelter, *supervision*, medical care, or education, when that refusal, failure, or inability is not due primarily to a lack of financial means on the part of the parent, guardian, or custodian;

(Emphasis added).

While the specific phrase "failure to protect" or "failure to supervise" was not contained in the petition, I believe that the incredibly detailed information contained in the petition regarding the abuse suffered by L.B.-2 sufficiently asserts a claim for failure to protect or supervise. The petition alleges very specific injuries to L.B.-2, and that L.B.-2 suffered systematic abuse, not just a one-time unexplained incident. It is difficult for me to imagine that such petition could be deemed inadequate to allege that the mother, as the custodial parent of L.B.-2 for his entire life, failed to protect and/or supervise L.B.-2.

Indeed, the majority, in its recitation of the relevant facts, describes the injuries suffered by L.B.-2:

> A CT scan revealed that L.B.-2 had sustained a brain bleed and skull fracture; he was then transported to Ruby Memorial Hospital in Morgantown, West Virginia, via ambulance. At Ruby Memorial, an MRI revealed bilateral subdural hematomas with "varying ages" of

---

[23] The circuit court immediately stayed its own order so that these children did not have to return to the environment in which this serious abuse occurred while our Court considered this appeal.

12

hemorrhage, indicating multiple injuries in various stages of healing. In addition, physicians noted retinal hemorrhages "too numerous to count[.]" His injuries were determined to be non-accidental.

The majority further describes the medical findings regarding L.B.-2's injuries:

At the April 7, 2022, preliminary hearing, testimony was taken from Dr. Vincent Arnone, a neurologist at Ruby Memorial who treated L.B.-2. Dr. Arnone testified that L.B.-2 had multiple hematomas of varying ages and a skull fracture that was caused by "high velocity" forces indicative of child abuse. He testified that the injuries were not consistent with a fall from a couch and the only accidental cause he could project with sufficient force to cause such injuries would be a car accident, a fall down multiple flights of stairs, or a fall from a height of six to eight feet. He opined that the retinal hemorrhages were caused by "repeated movements" such as shaking a child. He also testified that over the skull fracture area there was a "goose egg" that would have been visible.

It is important to recognize that, regardless of who actually inflicted these injuries on L.B.-2, the abuse took place repeatedly and during the time in which the petitioner was the custodial parent. In addition, those injuries could not have been inflicted over many months or years because this child was only seventy-five days old.

Although the majority attempts to distinguish the facts here from those in *In re Jeffrey R.L.*, 190 W. Va. 24, 435 S.E.2d 162, (1993), I believe that case is directly on point and fully supports removal of L.B.-1 and L.B.-2 from the abusive environment. Much like the child at issue in *Jeffrey R.L.*, at the time L.B.-2 suffered horrific injuries, he "was under his mother's care and the care of those individuals with whom she entrusted him." *Id* at 34, 435 S.E.2d at 172. This Court properly reversed the circuit court's decision to return the custody of Jeffrey R.L. to his mother "despite the fact that the perpetrator ha[d] not been identified." *Id.* at 35, 435 S.E.2d at 173. Our reasoning in refusing to return Jeffrey R.L. applies equally in this case:

Establishing the identity of the person or persons who inflicted these injuries on Jeffrey R.L. is crucial to his health, safety and welfare. . . .Yet, despite the fact that the perpetrator has not been identified, the circuit court returned custody of Jeffrey R.L. to his mother. *We find that the circuit court clearly erred in returning Jeffrey R.L. to his mother before the perpetrator who inflicted such extensive physical abuse on this helpless infant has been identified.*

There is no reasonable likelihood that the conditions of abuse can be substantially corrected because the perpetrator of Jeffrey R.L.'s physical abuse has not been identified. Jeffrey R.L., due to his young age and physical condition, needs consistent close interaction with fully committed adults. Jeffrey R.L.'s health, safety and

13

welfare would be seriously threatened if he were to be placed back into the environment where he suffered extensive physical injuries when his abuser has not been identified. *Therefore, because it appears that Jeffrey R.L.'s abuser will never be identified, this Court will not place him back into the environment where he suffered his abuse.*

*Id.* (Emphasis added).

The majority attempts to distinguish the present case from *Jeffrey R.L.* by pointing out, in footnote 20 of the majority opinion, that *Jeffrey R.L.* stands for the principle that "parental rights may be terminated where a child has suffered extensive physical abuse and 'the parents, even in the face of knowledge of the abuse, have taken no action to identify the abuser.'" However, rather than attempting to identify the abuser, the mother in this case, like the mother in *Jeffrey R.L.*, provided implausible explanations for L.B.-2's injuries that are inconsistent with the medical evidence. Some of the possible explanations offered by the petitioner here are alarmingly similar to those made by the mother in *Jeffrey R.L.*:

> Yet, his mother, Gail L., gave several possible explanations for the injuries to Jeffrey R.L. She stated that he could have suffered these injuries while he was rolling around in his crib. However, the crib was found by the social worker to be well-padded. Gail L. also stated that his injuries could be the result of a genetic bone disease from which her grandfather suffered. . . . Furthermore, Gail L. offered the explanation that Jeffrey R.L. suffered his injuries during birth, despite the fact that the evidence in the record reveals Gail L. experienced a normal vaginal delivery. None of the evidence in the record supports any of Gail L.'s explanations of Jeffrey R.L.'s injuries.

*Id.* at 34, 435 S.E.2d at 172. Here, similar to the explanations given by the mother in *Jeffrey R.L.*, the petitioner stated that she honestly believed an "accident" happened while L.B.-2 was at his sitter's house, or that his injuries resulted from her emergency C-section delivery of L.B.-2 or from a "blood deficiency" suffered by L.B.-2. Clearly, such explanations are inconsistent with the medical evidence related to L.B.-2's injuries.

Despite the majority's efforts to distinguish this case from *Jeffrey R.L.*, it is impossible to deny the stark similarities between the two cases. Ultimately, the crux of the holding in *Jeffrey R.L.* is this Court's determination that "because it appears that Jeffrey R.L.'s abuser will never be identified, this Court will not place him back into the environment where he suffered his abuse." *Id*. at 35, 435 S.E.2d at 173. I firmly believe that this same principle should have been followed in this case. Instead, L.B.-2 will be returned to the environment where he suffered horrific abuse.[24]

---

[24] The majority further rejects the argument made by DHS and the guardian ad litem that the best interests of the child, L.B.-2, prohibits his return to the environment in which his abuse occurred. Relying on *In re K.L.*, 233 W.Va. 547, 759 S.E.2d 778 (2014), the majority declined to apply the rule that "the best interest of the child is the polar star by which decisions [affecting (continued . . .)

I believe that this Court was presented with an opportunity to correct the error that occurred below but chose not to take steps to do so. Indeed, even if the majority believes that the petition failed to adequately allege that the petitioner failed to protect L.B.-2 from the abuse he suffered, this Court has, in past cases, remanded abuse and neglect cases with instructions that the DHS file amended abuse and neglect petitions. Certainly, the same course could have been followed here. *See In re K.B.,B.B., and N.B.*, No. 14-0900, 2015 WL 5666987, at *5 (W. Va. September 24, 2015) (memorandum decision) (concluding that it was in the "best interests of the children" for the case to be remanded and ordering the DHS to "file an amended abuse and neglect petition asserting its basis for alleging that the petitioner [] abused and/or neglected" three of the children at issue in that case); *In re A.P.-1, A.P.-2, A.P.-3*, 241 W. Va. 688, 695, 827 S.E.2d 830, 837 (2019) (remanding an abuse and neglect case with instructions "to permit [DHS] to file an amended abuse and neglect petition, if warranted, alleging any and all claims that it may have against the Petitioner.").

Although the facts of this case may have left the circuit court with a difficult choice and, by its own words, it dismissed the petition "with hesitancy," I am "left with the definite and firm conviction that a mistake has been committed." Syl. Pt. 1, in part, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996). The inability to determine the perpetrator in this case simply did not justify dismissal of the petition and the potential return of L.B.-2 and his brother to the environment in which this abuse occurred.

For these reasons, I respectfully dissent from the majority's decision in this case.

---

them] must be made." However, the facts of *In re K.L.* differ sharply from those in the present case. In *In re K.L.*, "the DHHR's petition against the petitioner was based solely on the prior involuntary termination [of a sibling of K.L.], without further allegations." Id. at 554, 759 S.E.2d at 785. The court in that case held that the DHHR's failure to present additional evidence improperly shifted the burden to the mother of K.L. to disprove the allegation of abuse and neglect. Here, unlike *In re K.L.*, the circuit court expressly found "it does remain true and clear that the evidence would support a finding that child abuse occurred here, …" It is inconceivable that, where abuse was clearly established and took place while L.B.-2 was in the custody of petitioner, the fact that the individual who committed such abuse has not been identified would remove this child from the bedrock principle that the best interest of the child is the "polar star" governing this action. See *State ex rel. L.D. v. Cohee*, 247 W.Va. 695, 885 S.E.2d 633 (2022) (C.J. Hutchison concurring) (the polar star relating to the best interest of the child "applies also in the interpretation of the abuse and neglect statutes.").